WILSON v. WALL.

1. *Semble*, that under the treaty of the United States with the Choctaws, in 1830, by which the United States agreed that each Choctaw head of a family desirous to remain and become a citizen, &c., should be entitled to one section of land; "and in like manner shall be entitled to one-half that quantity *for* each unmarried child which is living with him over ten years of age, and a quarter section *to* such child as may be under ten years of age, *to adjoin the location of the parent;*" no trust was meant to be created in favor of the children. They were named only as measuring the quantity of land that should be assigned to the head of the family.

2. However this may be, if under the assumption that no trust was meant to be created, the United States have issued under the treaty a patent to a Choctaw head of a family, individually and in fee simple for all the sections, a purchaser from him *bona fide* and for value will not be affected with the trust, even though he knew that his vendor was a Choctaw head of a family, and in a general way that he had the land in virtue of the treaty.

3. Where it is sought to affect a *bona fide* purchaser for value with constructive notice, the question is not whether he had the means of obtaining, and might by prudent caution have obtained the knowledge in question, but whether his not obtaining it was an act of gross or culpable negligence.

ERROR to the Supreme Court of Alabama.

By the fourteenth article of a treaty made in 1830, between the Choctaw Indians and the United States, by which the

---

Choctaws ceded their territories to the United States, it was thus stipulated:

"Each Choctaw head of a family being desirous to remain and become a citizen of the States, shall be permitted to do so by signifying his intention to the agents, &c., and thereupon be entitled to a reservation of one section of six hundred and forty acres of land, to be bounded by sectional lines, and in like manner, shall be entitled to one-half that quantity *for* each unmarried child, which is living with him, over ten years of age; and **a** quarter section *to* such child as may be under ten years of age, *to adjoin the location of the parent.*"

Hall was such a head of a family, and at the .date of the treaty had living with him seven children, of whom three were over and four under ten years of age. This gave one section as respected himself, and two and a half sections as respected his children. Having reported to the agent of the United States in making his claim, the number and ages of his children, but not their names, he secured a reservation of three and a half sections, including the section on which he lived. In 1841, a patent issued to him directly for the whole three and a half sections; the instrument reciting that these had been "located in favor of the said William Hall as *his* reserve." The words of grant in the patent "were to him and *to his heirs,*" with a *habendum,* "*to his or their heirs and assigns forever.*"

In 1836, anticipating the issue of the patent, he sold the whole three and a half sections for $750, which was paid him, to one Wilson, who took possession and made valuable improvements on the land.

In April, 1849, Hall himself being dead, his children, now grown up, filed a bill in the Chancery Court of Alabama, against Wilson, to recover the two and a half sections, which were granted as respected them. Wilson admitted in his answer, knowledge that Hall was a Choctaw head of a family entitled to a reservation, but denied knowledge of what article of the treaty he claimed under.

It was conceded that in ascertaining to whom the patents

should issue for the lands under the treaty in question, it was not customary to take down or return to the government the names of children of heads of families, but that in executing the treaty, the agent returned the names of heads of families, with the number and ages of their children; and that in issuing the grants in fee simple, it had been customary to issue them in the form of the patent to Hall, until the year 1842. In that year an act was passed by Congress,* directing that as to lands located for Choctaw children, the patent should issue to such "Indian child if living," and if not living, to his heirs and representatives. A statute had previously passed,† referring to article fourteenth of the treaty, and appointing commissioners with full power to examine and ascertain the names of persons who had fulfilled the conditions of settlement so as to entitle them to patents, and to ascertain the quantity for each child "*according to the limitations contained in said article.*"

It also seemed that from the date of the treaty down to the act of 1842, the construction of the Executive Department had been, that no provision was made for children as independent beneficiaries, but that they were named as measuring the quantity of land that should be assigned to the head of the family. At least, referring to these provisions, the Commissioner of Indian Affairs had said to the Attorney-General in 1842:

"These words were construed by Mr. Secretary Cass, to give to the parent the title to the halves and quarters of a section stipulated for, in right of the children. This construction has been the uniform one of the department in executing the treaty, and patents have issued accordingly, of the correctness of which no doubt has been entertained heretofore. The register of those that applied to the agent under the article, contained the names of the heads of families only, which would seem to show that the children were not entitled in the opinion of the Indians themselves who furnished the materials for the register."

---

\* 5 Stat. at Large, 515.                           † Id. 180.

On this case the questions were,

1. Whether, on a true construction of this fourteenth arti-cle of the treaty, Hall himself had held the two and a half sections adjoining the one on which he lived *in trust* for his children?

2. Whether, if he had himself held the sections in trust, Wilson, a *bona fide* purchaser for value, was affected with notice of that trust, the same not having been set forth on the face of the patent to Hall?

The Supreme Court of Alabama, where the suit finally went in that State, was of the affirmative opinion on both points.*

On the first question, that court's view was,—although a grant to one person *for* another, ordinarily created a trust,—that here the expression "*for* each unmarried child" might be admitted, if by itself, to be equivocal. But the words im-mediately following—"and a quarter section *to* such child as may be under ten"—the court thought shed light on the previous obscure expression, and sufficiently indicated the sense in which it was used. This was made more plain, the court considered, by the direction that the lands given in respect of the children should "adjoin the location of the parent." What was meant by the location of the parent? Obviously the section on which the parent's "improve-ment" was situated, where he lived, and which was re-served to him in absolute right. Lands which *adjoined* a parent's could hardly be deemed lands of the parent himself. The construction given to the article by the Executive De-partment of the government, and the form in which the patents were issued could not, the court conceived, change the meaning of the words of the treaty, nor control any court in interpreting them. There was therefore a trust for the children.

*On the second question,* the Supreme Court of Alabama thought that as Wilson knew when he made his purchase that Hall was "the Choctaw head of a family" and that

* See 34 Alabama, 288.

his right arose under the treaty, he ought, as a prudent man, to have inquired further.    Lord Mansfield's language in *Keech v. Hall*,* was that "whoever wants to be secure should inquire after and examine the title deeds."    Had Wilson made an examination of the treaty it would have informed him,—so the court considered,—that the right of Hall was confined to the single section on which his improvement was situated, and that all the rest of the land was for his children.    He had failed to make an inquiry which it was his duty to make; and a court of equity would accordingly treat him as if he had actual notice.

Judgment having gone therefore in favor of the children, the case was now for review, here, where it was fully argued by *Mr. P. Phillips for the appellants*, in opposition to the view enforced by the State court of Alabama in its opinion as above presented.    *No opposite counsel appeared.*

·   Mr. Justice GRIER delivered the opinion of the court.

When the United States acquired and took possession of the Floridas under the Louisiana treaty, the treaties which had been made with the Indian tribes remained in force over all the ceded territories, as the laws which regulate the relations with all the Indians who were parties to them.·  They were binding on the United States as the fundamental laws of Indian right, acknowledged by royal orders and municipal regulations.    By these, the Indian right was not merely of possession, but that of alienation.

The parties to this contract may justly be presumed to have had in view the previous custom and usages with regard to grants to persons "desirous to become citizens."    The treaty suggests that they are "a people in a state of rapid advancement in education and refinement."    But it does not follow that they were acquainted with the doctrine of trusts. With them lands were either held in common by the whole nation or tribe, and the families were its fractions or portions. The head of the family could dispose of the property of the

---

* Douglas, 22

family as the heads of the tribe or nation could that of the nation.

Under the Spanish and French dominions, grants of land were always made to individuals in proportion to the number of persons composing the family. Thus, in *Frique* v. *Hopkins*,* the court said as follows:

"By the regulations of the Spanish government, if the individual who applied for land was unmarried, a certain quantity was given to him; if he had a wife this quantity was increased, and if he had children an additional number of acres were conceded. Now, if the circumstance of his being married made the thing given become the property of both husband and wife, we must, on the same principle, hold that where children were the moving cause, they too should be considered as owners in common of the land conceded. *That such was the effect of the donee having a family, was never even suspected. It certainly is unsupported by law.* Many donations are made in which the donee's having a wife and being burdened with a large family is a great consideration for the beneficence of the donor, but this motive in him does not prevent the person to whom the gift is made from being considered its owner, nor prevent the thing from descending to his heirs."

We can hardly expect the Indians to be very profound on the subject of adverbs or prepositions, and the agents of the government do not seem to have exhibited much greater knowledge of the proprieties of grammar, or they would not have left this section of the treaty capable of misconstruction or doubt when it was so easy to avoid it. The words of this 14th section of the treaty were construed by Mr. Secretary Cass, to give to the parent the title to the whole. This construction had been the uniform one of the department in executing the treaty, and patents were issued accordingly, of the correctness of which no doubt was entertained. The register of those that applied to the agent under the article, contained the names of the heads of families

---

* 4 Martin, 212.

only, which would seem to show the Indian construction of the contract or treaty. Accordingly, on the 29th of June, 1841, a patent was granted to William Hall, *not* for himself and his children—but to him and his heirs. At this time the Secretary had no means of ascertaining the names of the children so that separate patents might be given them in case of a different construction given to the treaty. In all others of the numerous treaties made with the Indians (more of them made by Governor Cass than by any other person), where lands were reserved, or agreed to be granted to any Indian, the name of the grantee and quantity to be given were carefully stated in the treaty.

As this section of the treaty was capable of a different construction, Congress, on the 23d of August, 1842, in order to save something for the children from the folly or incapacity of the parent, appointed commissioners with full power to examine and ascertain the names of the parties who had fulfilled the conditions of settlement to entitle them to patents for their land, and ascertain the quantity for each child, *"according to the limitations contained in said article."*

Now, while it is freely conceded that this construction given to the treaty should form a rule for the subsequent conduct of the department, it cannot affect titles before given by the government, nor does it pretend to do so. Congress has no constitutional power to settle the rights under treaties except in cases purely political. The construction of them is the peculiar province of the judiciary, when a case shall arise between individuals. The legislature may prescribe to the executive how any mere administrative act shall be performed, and such was the only aim and purpose of this act.

In the Cherokee treaty, where a grant of 640 acres was given to persons "willing to become citizens," a life estate only was given to the settler, with *reversion to his children.* This treaty makes no such provision for children. The construction given by the representatives of both parties to the treaty, and the grants issued under it, were not revoked, nor could they be, by mere legislative act, founded on a different

construction of a doubtful article of the treaty. The treaty only describes the person who is contingently entitled to the reservation. He must be a Choctaw, and a head of a family, and *desirous not only* to remain, but must signify to the agent his *intention to do so.* These are conditions precedent, on the performance of which he shall, "*thereupon* be entitled to a reservation of 640 acres, and *in like manner shall be entitled* to half that quantity *for* each unmarried child which is living with him over ten years, and a quarter section *to* such child as may be under ten years," and if they reside upon the land, intending to become citizens for *five years, &c.,* "*a grant in fee-simple shall issue,*" *&c.* The father alone could fulfil the conditions; he would not be entitled to the additional land unless for a child that "*was living with* him." The treaty did not operate as a grant, and a patent was necessary to the person who alone could perform the conditions.

We do not consider it necessary to vindicate the conclusion to which we have arrived in this case, by further argument on the grammatical construction of this section of the treaty. Assume that the construction put on the treaty by the court below may possibly be correct. What then are the facts of the case? The complainants below have applied to a court of chancery, which should be a court of conscience, to vacate the title of a *bona fide* purchaser, who purchased and paid his money and expended a life's labor on land granted by patent from the United States, conveying a fee-simple estate, which was issued by the officers of the government without intention of imposing any trust on the grantee, or limiting it on the face of the deed.

It is contended that the purchaser is affected with notice of the terms of the treaty referred to in his patent.

If there be any trust for children it must be a constructive trust, which is negatived by the express terms of the grant. How can a chancellor build up by the words *for* and *to*—words of equivocal import and doubtful construction—an equitable title in the children? The fact is clear that such was not the construction under which the grantor gave the deed or the grantee accepted it. A chancellor will not

be astute to charge a constructive trust upon one who has acted honestly and paid a full and fair consideration without notice or knowledge.   On this point we need only to refer to Sugden on Vendors,* where he says: "In *Ware* v. *Lord Egmont* the Lord Chancellor Cranworth expressed his entire concurrence in what, on many occasions of late years, had fallen from judges of great eminence on the subject of constructive notice, namely, that it was highly inexpedient for courts of equity to extend the doctrine.   When a person has not actual notice he ought not to be treated as if he had notice unless the circumstances are such as enable the court to say, not only that he *might have acquired*, but also that he ought to have acquired it but for his gross negligence in the conduct of the business in question.   The question then, when it is sought to affect a purchaser with constructive notice, is not whether he had the means of obtaining and might by prudent caution have obtained the knowledge in question, but whether not obtaining was an act of gross or culpable negligence."

The application of these principles of equity to the present case is too apparent to need further remark.

JUDGMENT REVERSED.