## CITY OF TRINIDAD v. MILWAUKEE & TRINIDAD SMELTING & REFINING CO.

**(Circuit Court of Appeals, Eighth Circuit. October 15, 1894.)**

### No. 401.

1. **DONATION BY CITY TO MANUFACTURING COMPANY—FRAUD—CONSTRUCTIVE NOTICE TO COMPANY.**

The citizens of a certain city, and their committee, agreed with a smelting company to donate to it certain land for a smelter, on condition that it would erect thereon a smelting plant costing $50,000. The land was bought by such citizens, and deeds taken in the name of one of them as trustee. Afterwards the company erected thereon a smelter costing $80,000, and complied with the contract, and such trustee conveyed to it the land. The city council, on the petition of citizens, appropriated $17,500 for the ostensible purpose of straightening a stream running through the city, but intending to use the money for the purpose of paying for the land purchased as a site for a smelter, and it was so used. The company's representatives dealt entirely with the citizens and their committee, and had no actual knowledge of the manner in which the land was paid for. *Held,* that the fact that the land was deeded to and by such citizen as trustee did not charge the company with constructive notice of the fraudulent use of the city's money in the purchase of the land, and did not entitle the city to a lien thereon for such sum.

2. **SAME.**

The rules relating to constructive notice, applicable to this case, stated.

Appeal from the Circuit Court of the United States for the District of Colorado.

This was a bill by the city of Trinidad, Colo., against the Milwaukee & Trinidad Smelting & Refining Company, to establish and enforce a lien on land donated to defendant, and paid for by an appropriation of the funds of such city. From a decree of the circuit court dismissing the bill, complainant appeals. Affirmed.

Everett Bell, for appellant.
Edward L. Johnson, for appellee.

Before CALDWELL, SANBORN, and THAYER, Circuit Judges.

CALDWELL, Circuit Judge. This is a suit in equity brought by the appellant, the city of Trinidad, against the appellee, the Milwaukee & Trinidad Smelting & Refining Company (hereinafter called the "smelting company"), a corporation chartered under the laws of the state of Wisconsin, to establish and enforce a lien for $17,500 on the land upon which the smelting company has erected its smelting works. The theory of the bill is that the city council of Trinidad fraudulently appropriated and used that sum of money to purchase the land for the use of the smelting company, and that the smelting company took title with notice, either actual or constructive, of this fact. There is no contention over the fact that the land was originally purchased with money raised by the sale of city warrants issued for that purpose; but the smelting company denies that it had notice, actual or constructive, of the fact, and pleads that it is a bona fide purchaser for value, without notice; and the material and contested issue in the case arises on this plea.

In June, 1889, John C. Hoffman and other stockholders of the Copper King Mining, Smelting & Refining Company of New Mexico, a corporation of Wisconsin, which afterwards changed its name, and became the Milwaukee & Trinidad Smelting & Refining Company, the appellee in this case, left Milwaukee, for the mining regions of the Southwest, with a view of locating and erecting smelting and refining works at some place in that region. They expected to go to New Mexico, but at Denver they met Mr. Floyd, who induced them to visit Trinidad, with a view of locating their works there. Mr. Floyd preceded them to that place, and, immediately upon their arrival at Trinidad, several of the property owners and business men of the place met them, and expressed an earnest desire to have them locate the proposed smelting works in that town, and, to bring about this desirable result, intimated their readiness to raise them a reasonable donation or bonus. After the citizens had shown different sites for a smelter, the representatives of the smelting company selected the site upon which the smelter was afterwards erected, and informed the citizens of the city, who were anxious to know what would induce them to build the smelter in Trinidad, that if the citizens would procure for them the site they selected, free of cost, they would erect a smelter thereon. The proposition was eagerly accepted by the citizens, and a public meeting of the citizens was

held, at which a committee was appointed to raise the funds, and do whatever was necessary to procure the title to the site selected. Shortly thereafter, the committee purchased several parcels of land comprising the site, and had them conveyed to "E. D. Wight, trustee;" and on the 28th of August, 1889, Wight, trustee, conveyed the same, by warranty deed, to John C. Hoffman, a representative of the smelting company; and on the same day, as a part of the same transaction, Hoffman entered into a contract with Wight, who was trustee for, and acting on behalf of, the citizens, whereby Hoffman, on behalf of the smelting company, in consideration of the execution of the deed by Wight to him for the site of the smelter, agreed to erect thereon a smelting plant of the capacity and dimensions described in the contract. Very soon thereafter the smelting company began the erection of a smelter on the land, which was completed within the time provided by the contract, and complied in all respects with the requirements of the contract. How fully the smelting company complied with its obligations to the citizens is shown by the following communication from the committee representing the citizens to their trustee, Mr. Wight:

"Edward D. Wight, Esq., Trinidad, Colo.: The undersigned, acting as a committee in behalf of the citizens of Trinidad, pursuant to the conditions under which certain real estate lying contiguous to said city was donated to the Copper King Smelting and Refining Company for the purpose of the construction and operation of a smelting plant by said company, have visited and inspected the buildings, machinery, and other appliances erected by said company on the land referred to, for the purpose of determining whether the company has complied with the terms of the agreement under which the property was donated by the citizens of Trinidad. We take pleasure in stating that the company, under the direction and superintendence of Mr. Thormeier, its general agent and financial manager, has complied in every particular with the conditions named in the agreement. He has done more than merely comply with the agreement, and has expended a sum of money very considerably in excess of the amount required to be expended by the company before it should receive a clear title to the property donated. The company has not only already expended a sum considerably in excess of $50,000, but has under way additional structures and appliances, which it is intended to complete at an early day, that will require the expenditure of a still further sum of money. We have been much gratified at the absolute good faith manifested by the company, through its legal representative, Mr. Thormeier, and the correct business principles upon which this enterprise has been conducted from its inception; and we feel justified in the prediction that this plant, when in operation, will materially add to the prosperity of the community. As such committee, we advise that you execute to the company such release as may be necessary to vest in it a clear title to the property donated.                                         Caldwell Yeaman,
                                                    "John Conkie,
                                                    "M. Beshoar,
                                                    "Ed. B. Sopris.
                                                    "H. E. Mulnix,
                                                                "Committee.

"Trinidad, June 11, 1890."

The total cost of the smelting plant erected on the land was about $80,000. When the site was selected, it comprised several tracts owned by different persons, all of whom conveyed to Wight, trustee, representing the people of Trinidad. The total cost of the land was about $17,000.

. It now appears that the money to purchase the land was procured .in this way: On the 11th day of July, 1889, some of the citizens of the city of Trinidad presented to the city council a petition asking for an appropriation of $17,500 for the purpose of straightening the Las Animas river, which runs through the city. Thereupon, the city council, by resolution, authorized the mayor to appoint a committee, to be composed of three members from the city council and five citizens of the city, with power to contract for the straightening of the river through the city, and to expend $17,500 for that purpose. The mayor appointed the committee. On the 7th of August, 1889, at a meeting of the city council, the committee reported that they had contracted with certain persons, whose names were given, for straightening the river through the city; that the contract price for the work was $17,500; and that the contractors had performed the work, and were entitled to be paid that sum. Thereupon, the city council allowed the contractors $17,500, for which city warrants were immediately issued and delivered to the committee previously appointed by the mayor to contract for straightening the river, who immediately sold them, and with the money derived from the sale of these warrants the land selected as a site for the smelter was purchased and paid for, and deeds therefor executed by the several vendors to "E. D. Wight, trustee." No bona fide contract was ever entered into for straightening the river, and it was not straightened. It was well understood by the mayor and city council and the committee appointed by the mayor that the $17,500 was not to be expended in straightening the river, but was to be used in purchasing the site for the smelter. What was said and done about straightening the river was a mere device to make it appear upon the record that the warrants for $17,500 were issued for a lawful purpose. The authorized representatives of the smelting company were not parties to, and had no knowledge of, this fraudulent scheme. From the inception of the business to its close, they dealt exclusively with the citizens and the citizens' committee. They had no communication or dealings with the city, or the committee composed of citizens and councilmen appointed by the mayor. It is apparent that the members of the city council, and the persons acting in concert with them, who conceived and carried out this monstrous fraud on the city, were not proud of their achievement; and the knowledge of their action was withheld from the public, and particularly from the representatives of the smelting company. Publicity would have defeated the scheme. The warrants could not have been sold, and it is highly probable the smelting company would have declined to accept the land if it had known it was acquired by any such fraudulent devices. We are satisfied that, at no time before the smelting company erected its plant on the land, were any of its officers or agents advised that the funds to purchase the land had been raised in the manner stated. In consideration that the smelting company would erect its smelter in Trinidad, the citizens agreed to donate the site therefor. There was nothing in this agreement to excite suspicion on the part of the smelting company. The donation of a site to induce the location

of a large manufacturing plant like this, by the property owners and business men of a new and growing town, was not a suspicious circumstance, or one which would impose on the donee the obligation to inquire where the donors got the money to purchase the land. Donations of this character are of common occurrence. The smelting company believed, and had reason to believe, that the citizens with whom it dealt had acquired the title to the land which had been conveyed to Mr. Wight, their trustee, in a legitimate mode. Certainly, the smelting company, in the absence of express information on the subject, could never have conceived or suspected that the city council would have given its sanction to any such extraordinary scheme as that by which the city was made to pay for the site. Such action by a city council is believed to be unprecedented, and, before this precedent, would have been regarded as incredible.

But it is earnestly contended that, if the officers and agents of the smelting company did not have actual notice that the city's money was used to purchase the land, they are chargeable with constructive notice of that fact. This contention is rested on the word "trustee," following the name of Wight, in the deeds made to him by the different persons who conveyed to him the several parcels of land comprising the site, and also in the deed made by him to Hoffman for the land on the 28th of August, 1889, and the agreement between the same parties of that date, heretofore mentioned, showing the conditions upon which the deed was made. It is said in the brief of the learned counsel for the appellant that "unless the word 'trustee,' after the name of Wight, may be regarded as mere descriptio personae, and rejected as a nullity, there was a plain and actual notice of a trust of some description." The trust was not declared in the deeds, but in the light of the agreement between Wight and Hoffman, of the 28th of August, 1889, which expressed the understanding previously agreed upon between Hoffman and the citizens' committee, there could be no doubt as to what it was. Wight had no connection with the city. He was acting for and on behalf of the citizens' committee. That committee agreed with Hoffman to purchase and pay for the land, and cause it to be conveyed to the smelting company. Through the agency of this committee, it was conveyed by the former owners to Wight upon the trust that he would hold the title for the committee, and convey the same to the smelting company upon its agreeing to erect its smelting plant thereon. Wight was not a trustee for the former owners. They received their purchase money, and made absolute and unconditional conveyances. All the circumstances, within the knowledge of the smelting company, were calculated to satisfy any one that the trust relation occupied by Wight was none other than that we have indicated. The company expended $80,000 on the land without a suspicion of the existence of the facts upon which the alleged trust set up in the bill is predicated. When it is sought to bind a party by constructive notice, "there must appear to be, in the nature of the case, such a connection between the facts discovered and the further facts to be discovered that the former may be said to furnish a clue—a reasonable and natural clue —to the latter." Birdsall v. Russell, 29 N. Y. 220, 250. In this case

there was not the remotest connection between what the smelting company actually knew, or had any reason to suspect, and the claim now set up by the city. The rules upon constructive notice in this class of cases are well settled. In Jones v. Smith, 1 Hare, 43, the vice chancellor states the rule thus:

"If there is no fraudulent turning away from a knowledge of the facts which the res gestae would suggest to a prudent mind; if mere want of caution, as distinguished from fraudulent and willful blindness, is all that can be imputed to the purchaser,—then the doctrine of constructive notice will not apply; then the purchaser will, in equity, be considered, as in fact he is, a bona fide purchaser without notice."

In Ware v. Lord Egmont, 4 De Gex, M. & G. 473, the lord chancellor said:

"Where a person has actual notice of any matter of fact, there can be no danger of doing injustice if he is held to be bound by all the consequences of that which he knows to exist. But where he has not actual notice he ought not to be treated as if he had notice, unless the circumstances are such as to enable the court to say, not only that he might have acquired, but also that he ought to have acquired, the notice with which it is sought to affect him; that he would have acquired it, but for his gross negligence in the conduct of the business in question. The question, when it is sought to affect a purchaser with constructive notice, is not whether he had the means of obtaining, and might, by prudent caution, have obtained, the knowledge in question, but whether the not obtaining it was an act of gross or culpable negligence."

This statement of the rule is approved by the supreme court in Wilson v. Wall, 6 Wall. 83, where that court says:

"A chancellor will not be astute to charge a constructive trust upon one who has acted honestly, and paid a full and fair consideration without knowledge."

Upon the facts, as we find them, the appellee is not chargeable either with actual or constructive notice of the claim set up by the city; and the decree of the circuit court, dismissing the bill for want of equity, is affirmed.