## Stephen G. Havighorst v. Willis D. Bowen, et al.

### Gen. No. 11,290.

1. RELEASE OF TRUST DEED—*when, not set aside.* A release of a trust deed, executed before the maturity of the indebtedness secured by its terms, will not be set aside at the instance of the purchaser of the indebtedness purporting to be secured thereby, as against the *bona fide* holder of a subsequent encumbrance who had no notice of the want of authority upon the part of the trustee to release the prior mortgage, notwithstanding such *bona fide* holder had made no inquiries with respect to the payment of such prior encumbrance, it appearing that the payee named therein had, at the time of the acquisition of such encumbrance, by such subsequent encumbrance, become the owner of the fee title.

2. EQUITIES—*how regarded as between encumbrancers seeking priority.* A claim acquired in good faith and in due course of business is regarded as having the superior equity over another claim which is stale and apparently acquired by way of speculation and not in good faith.

Bill to cancel release and foreclose. Appeal from the Superior Court of Cook County; the Hon. JESSE HOLDOM, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1903. Affirmed. Opinion filed October 4, 1904.

**Statement by the Court.** This is an appeal from a decree dismissing a bill filed by appellant to cancel a release of a trust deed and to foreclose the trust deed. The instruments were executed under the following circumstances:

On August 11, 1890, Euphemia J. Neill, being the owner of two lots in Chicago, of which one was improved and the other vacant, together with Robert Neill, her husband, made a trust deed thereon to secure $4,000 owing to Brayton S. Harris. August 20, 1892, Harris filed his bill to foreclose said deed and obtained a decree of sale under which the premises were sold and a master's certificate of sale issued to him October 27, 1892. A few weeks before the certificate issued, Mrs. and Mr. Neill had conveyed the premises by warranty deed to their son-in-law, Willis D. Bowen, and on November 14, 1892, he and his wife executed a mortgage on the premises to a loan and homestead association, presumably to obtain from it the money with which to redeem from the foreclosure sale to Harris.

The mortgage purported to secure an indebtedness of $5,400, but no money was ever advanced by the association thereunder. Nevertheless, on January 4, 1893, the association purchased and became the owner of the Harris certificate of sale, and subsequently released of record the mortgage to it.

One Louis H. Mahnke and said Robert Neill were partners in the building business. They needed money on a house they were erecting, and on January 21, 1893, Mahnke borrowed $850 from one Henry Mathes, and gave him his collateral note therefor bearing date that day and payable seven months thereafter to the order of said Mathes with interest at seven per cent per annum, the note reciting that there had been deposited certain collateral and containing the usual power of sale. On April 3, 1893, said Bowen and his wife executed a trust deed upon the premises (being the one sought to be foreclosed herein) to Robert Neill, trustee, and said Mahnke, successor in trust, to secure Bowen's note of that date for $1,800, due in two years and payable to the order of Euphemia J. Neill, and four interest notes for $54 each, payable to the same order in six, twelve, eighteen and twenty-four months. The trust deed was recorded April 13, 1893, and it and the principal and interest notes after they had been endorsed by Mrs. Neill were delivered to Mahnke, who, upon maturity of the $850 note he owed Mathes, deposited with him Bowen's note for $1,800, and the four interest notes and the trust deed securing the same to take the place of the original collateral, which was returned to Mahnke and his note extended for six months. Bowen's notes thus received by Mathes as substituted collateral were purely accommodation paper, but of this Mathes had no knowledge.

Apparently, in order to take care of the certificate of sale then in the hands of the loan and homestead association and prevent the same from ripening into a deed, the Neills applied for a loan to the banking house of E. S. Dreyer & Co. For the purpose of enabling them to do so, Bowen, their son-in-law, and his wife conveyed the prem-

ises back to Mrs. Neill by quit-claim deed dated July 23, 1894, and two days thereafter Mr. Neill, without the knowledge of or authority from Mathes, released the trust deed sought to be foreclosed herein and then held by Mathes as part of his collateral, all of which remained with him.    At this time the notes secured by the trust deed had not matured.  The release and quit-claim were recorded August 29, 1894.    There is no proof that the release was delivered to or accepted by Bowen, or that he knew of its existence.

On August 8, 1894, there were recorded two trust deeds on the premises from Euphemia J. Neill and her husband to E. S. Dreyer, trustee, one for $2,500 on the improved lot, dated August 4, and the other for $1,500 on both lots, dated August 6.  The notes secured by the deeds were payable to Adolph Nissen five years after date, and were given to evidence a loan made by the bank to the Neills.  Out of the moneys so advanced the latter paid $3,840.90 to the homestead association for the Harris certificate.  No deed was taken out thereunder, and the same by lapse of time has become null and void.

On September 17, 1894, appellee Catherine Frillman purchased from the bank the $2,500 note, and appellee Charles J. Creighton the $1,500 note, together with the two trust deeds last mentioned securing them, both paying par value and accrued interest in cash.    Interest on the $1,500 note not being paid, Creighton filed his bill to foreclose the trust deed of August 6, 1894, making Mrs. Frillman a defendant thereto.    The latter filed her cross-bill to foreclose the trust deed of August 4, 1894.    Neither Bowen nor his wife, or Mathes or Robert Neill, trustee, or Mahnke, successor in trust, were made parties to the bill or cross-bill.    August 12, 1898, a decree of sale was entered upon the bill and cross-bill, and the premises sold September 13, 1898, the improved lot to Mrs. Frillman and the other one to Creighton.    There was no redemption, and in December, 1899, master's deeds issued to the purchasers, who duly filed them for record, and have been in possession of the premises ever since, claiming title under said deeds.

Mahnke's note to Mathes was extended at various times and the last interest paid thereon April 17, 1896, paying the same to January 21, of that year. Sixty dollars were paid on the principal March 9, 1896. Judgment was entered on the note in favor of Mathes in September, 1897.

On March 6, 1900, Mathes sold to appellant for the sum of $100 Bowen's note for $1,800, his four interest notes and the trust deed securing the same under and by virtue of the collateral note executed by Mahnke to Mathes. The latter did not learn until later that the trust deed had been released. Four months afterwards, July 5, 1900, appellant filed his bill herein, making Creighton, Mrs. Frillman and others defendants, and praying that the release of the trust deed be set aside and the trust deed foreclosed.

FRANK LYNCH, for appellant.

CASTLE, WILLIAMS & SMITH and GEORGE W. HESS, for aplees; BEN M. SMITH, of counsel.

MR. PRESIDING JUSTICE STEIN delivered the opinion of the court.

At the time appellees Frillman and Creighton purchased from the bank the two notes and trust deeds of the Neills, dated respectively August 4 and August 6, 1894, the deeds appeared of record to be first liens upon the premises, the release of the trust deed under which appellant is claiming having been filed shortly before. This release, however, was executed July 25, 1894, and the indebtedness secured by the released trust deed did not mature until April 3, 1895. As appears from the foregoing statement, the trust deed and the notes which it secured were then held by Mathes as collateral, and remained in his hands until he sold them to appellant nearly six years later; Mathes not having authorized the release and indeed not knowing of it until after the sale. It is therefore contended that the usual rule under which subsequent purchasers and incumbrancers, where the trust deed or mortgage has been released after maturity, may rely on the record, and under

which as to them, in the absence of notice to the contrary, the indebtedness is to be considered paid and discharged, although it may not be so as a matter of fact, does not apply; that appellees, being charged by the record with notice of the execution of the release by Neill of the Bowen trust deed before maturity, were put upon inquiry, and' that if they had inquired they would have learned that Bowen's notes were still outstanding.

In Ogle v. Turpin, 102 Ill. 148, the facts were that Runyan held several notes payable to himself, made by Allen, dated July 31, 1874, payable in one, two and three years and secured by mortgage of even date on lands in Cook county. For a valuable consideration Runyan, before maturity, indorsed the notes to the appellant, Ogle, and delivered them with the mortgage to him. In the spring of 1875 Allen conveyed the equity of redemption to Runyan, who thereupon, before the notes were due, released the mortgage of record and borrowed $20,000 from the Fidelity Savings Bank and executed to it his notes and a trust deed to Tripp to secure the same. A bill filed by Ogle against the bank to foreclose the mortgage which Runyan had released was dismissed, and the decree of dismissal was affirmed by both the Appellate Court and the Supreme Court. The latter say (pp. 151 and 152):

"Neither party denies the validity or fairness of the debt of the other, as against Runyan, or that both were liens on the property when the deed of trust was executed and delivered to Tripp, but the question is whether the bank did not obtain a superior lien by that deed, or took their lien subject to Ogle's, and the whole question seems to resolve itself into one of whether there was negligence on the part of the bank. Appellant claims that the bank had no right to rely alone on the record of the title to the property, which showed that it was clear, but as the notes given by Allen were not then due, that it should have made inquiry as to whether or not they were paid, and were not, as the fact proved to be, in the hands of an innocent holder and the bank having failed to exercise ordinary care, it

should have its claim postponed to that of appellant. On the other side it is claimed, that when it appeared that Runyan had procured Allen's equity of redemption in the property, and had released and satisfied his mortgage, the bank had a right to rely on the record, and was not bound to make further inquiry, and it took the preferred lien.

It has not been suggested of whom the bank should inquire. It inquired of Runyan, and he said the title was good for the property. Had the bank inquired of Allen, he could only have given information that he had not paid the notes, but could not have referred the bank to any person as assignee of the notes, and it was not required to go into the commercial world to find a holder. The mortgage showed the notes were payable to Runyan, and when he released the mortgage the bank had the right to presume the notes were paid, or if not, that he had waived and released the mortgage security, and was willing to look to the responsibility of the maker, or had obtained other security. We think the mere fact that the time of payment had not arrived, was not sufficient to put the bank on inquiry, or to charge it with notice that the notes had been indorsed to appellant, and were unpaid, and to give his claim a preference the bank must have had notice in fact, or of circumstances pointing to notice."

Williams v. Jackson, 107 U. S. 478, is very much like the case at bar. A trust deed was there involved as here, and a release was executed and placed on record before the maturity of the debt and without the knowledge of the holder of the notes. The payee named in them, Augustus Davis, joined in the release although he had already assigned them to a *bona fide* purchaser. In discussing that feature of the case the court say (p. 483): "The record not showing that any person other than Augustus Davis had any interest in the notes or in the land as security for their payment, an innocent subsequent purchaser or incumbrancer had the right to assume that the trustees in executing the release had acted in accordance with their duty." True, in the case at bar, Euphemia J. Neill, the payee of the

notes, did not join in the release, but two days before its execution, Bowen, the maker of the notes and trust deed, had conveyed to her the equity of redemption, thereby giving rise to the presumption, based upon the appearance of the record, that there had been a merger in her of both interests; in other words, that the conveyance to her operated as payment or satisfaction of the notes payable to her order. This presumption was materially strengthened by the record showing the execution of the release immediately after the conveyance to Mrs. Neill.

In Williams v. Jackson, *supra*, cited and reviewed with approval in Mann v. Jummel, 183 Ill. 523, the court say further (pp. 483 and 484):

" It was suggested in argument that as the first deed of trust showed that the notes secured thereby were negotiable and were not yet payable, and that the land was not intended to be released from this trust until all the notes were paid, Williams was negligent in not making further inquiry into the fact whether they were still unpaid. But of whom should he have made inquiry? The trustees under the first deed and the original holder of the notes secured thereby having expressly asserted under their own hands and seals that the notes had been paid, and Sweet and wife having apparently concurred in the assertion by accepting the deed of release and putting it on record, he certainly was not bound 'to inquire of any of them as to the truth of that fact; and there was no other person to whom he could apply for information, for he did not know that the notes had even been negotiated, and he had no reason to suppose that they had not been cancelled and destroyed.

To charge Williams with constructive notice of the fact that the notes had not been paid, in the absence of any proof of knowledge, fraud, or gross or willful negligence on his part, would be inconsistent with the purpose of the registry laws, with the settled principles of equity, and with the convenient transaction of business. Hine v. Dodd, 2 Atk. 275; Jones v. Smith, 1 Hare 43 and 1 Phillips 244; Agra Bank v. Barry, Irish R. 6 Eq. 128, and Law Rep. 7

H. L. 135; Wilson v. Wall, 6 Wall. 83; Norman v. Towne, 130 Mass. 52.

The equity of Williams being at least equal with that of the plaintiffs, the legal title held for Williams must prevail, and he is entitled to priority. The decree appealed from is in this respect erroneous and must be reversed."

Lennartz v. Quilty, 191 Ill. 174, substantially differs from the case at bar only in that the note secured by the trust deed was payable "on or before" maturity. It was held that the release of such a deed before the note had become absolutely due "is not a circumstance to excite inquiry." The subsequent purchaser, the court say, "was under no obligation or duty to see that the note was paid or cancelled." "Her only duty was to ascertain the condition of the title." In other words, she was not obliged to inquire whether the maker of the note had availed himself of his option to pay before maturity.

It is pertinent to consider of whom appellees Frillman and Creighton could or should have inquired as to the $1,800 note before or at the time they purchased their notes from Dreyer & Co. A quit-claim deed had been given by Bowen to Mrs. Neill, the payee of record in said note, and both the quit-claim and the release of the trust deed securing the note filed of record. On the record, as we have seen, there was a merger of title; that is, Bowen presumably gave the quit-claim to Mrs. Neill in payment of his $1,800 note to her, and the trustee two days thereafter released the same, making the title apparently clear. From whom, then, should appellees have inquired? Not from Mrs. Neill, because her interest of record as the payee of the note had been merged in the Bowen quit-claim deed and a release executed and filed of record of the trust deed securing that note. Appellees could not be expected to go into the world at large and inquire of different persons whether or not they had purchased that particular note. There was no circumstance to put them on inquiry, unless it be the mere fact that the trust deed was released before the maturity of the note; and this we do not think suffi-

cient in view of the uncontradicted proof that they were *bona fide* purchasers without notice of any want of authority in Neill to release the trust deed unless such want of authority appears in the record. But, as was said in Battenhausen v. Bullock, 8 Brad. 312: "The mere fact that the debt is outstanding and unpaid at the time the release is executed, cannot of itself alone, be regarded as presumptive evidence of fraud, or as tending to establish accident or mistake. We know from ordinary observation, that the release of a part or all of the mortgaged premises while the debt is unpaid or even before it matures, is not an unusual occurrence. It is frequently done by way of substituting new securities, or of carrying out some other new arrangement between mortgagor and mortgagee, and is in no way inconsistent with perfect good faith, or a full knowledge and understanding of the nature and effect of the instrument at the time of its execution."

It is proven and not denied that appellees bought the notes from the bank in the usual course of business and without any knowledge other than the record disclosed.

As between appellant and appellees the equities of the case are strongly with the latter. They acquired the two notes and trust deeds which are the source of their title in regular course and for full value. On the other hand appellant bought on March 6, 1900, for $100, a promissory note for $1,800, made on April 3, 1893, due two years thereafter, together with the four interest notes for $54 each, none of which had been paid; and the trust deed securing them stood released of record ever since August 29, 1894. When appellant bought, appellees were in possession of the premises, claiming title thereto of record adverse to all claimants under the Bowen trust deed. Just why appellant bought the notes and trust deed except to bring this suit either in his own interest or in that of somebody else, is hard to discover. The parties to the paper were all insolvent, and he bought it, as he himself testifies, simply because Mahnke had told him "it was a first mortgage on the property" and without looking at the records or hav-

in.; them searched. It is difficult to believe that he made the purchase in good faith. His own attorney, Rollins, says it was a speculation.· He was an employe of a hardware firm with whom Neill and Mahnke did business, and it looks somewhat as if he were acting as a catspaw for these parties or one of them in an effort to revive a stale and apparently abandoned claim.

The decree appealed from is affirmed.

*Affirmed.*