### BARTLETT v. OKLA OIL CO. et al.

(District Court, E. D. Oklahoma. September 29, 1914.)

No. 2012.

1. INDIANS (§ 18*)—LANDS—DESCENT ON DEATH OF ALLOTTEE.
    Under the legislation of Congress, culminating in Act April 28, 1904, c. 1824, 33 Stat. 573, and the Oklahoma Enabling Act (Act June 16, 1906, c. 3335, 34 Stat. 267), the lands of Indian allottees of the Five Civilized Tribes who died after admission of the state, both as respects homesteads and surplus lands, descend in accordance with the laws of the state, which, as provided by the Enabling Act and the state Constitution, were the laws in force in Oklahoma Territory until changed by state legislation.
    [Ed. Note.—For other cases, see Indians, Cent. Dig. § 49; Dec. Dig. § 18.*]

2. INDIANS (§ 15*)—CONVEYANCE OF LANDS OF DECEASED ALLOTTEE—APPROVAL BY COURT.
    Act May 27, 1908, c. 199, § 9, 35 Stat. 315, provides that "the death of any allottee of the Five Civilized Tribes shall operate to remove all restrictions upon the alienation of the allottee's land: Provided, that no conveyance of any interest of any full-blood Indian heir in such land shall be valid unless approved by the court having jurisdiction of the settlement of the estate of said deceased allottee." Held that, in approving a deed under such provision, the judge of a county court in Oklahoma acts ministerially, and not judicially, and that his finding of fact that the deceased allottee was a resident of that county at the time of death is subject to collateral attack.
    [Ed. Note.—For other cases, see Indians. Cent. Dig. §§ 17, 29, 34, 37–44; Dec. Dig. § 15.*]

3. INDIANS (§ 15*)—CONVEYANCE OF LANDS OF DECEASED ALLOTTEE—JURISDICTION TO APPROVE.
    The approval of a deed under such provision can only be made by the county court of the county of which the deceased was a resident, and which has jurisdiction of his estate, and its approval by the court of another county is unauthorized and void.
    [Ed. Note.—For other cases, see Indians, Cent. Dig. §§ 17, 29, 34, 37–44; Dec. Dig. § 15.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes.

**4.** INDIANS (§ 15\*)—CONVEYANCE OF LANDS—ESTOPPEL.

Because of the disabilities under which Indians are placed by the restrictions on the alienation of their lands, and their status as wards of the government, misrepresentations made by an Indian to secure the necessary approval of a deed made by him do not estop him, nor a subsequent grantee, from asserting the invalidity of such deed.

[Ed. Note.—For other cases, see Indians, Cent. Dig. §§ 17, 29, 34, 37–44; Dec. Dig. § 15.\*]

In Equity. Suit by H. U. Bartlett against the Okla Oil Company and others. On motion to dismiss amended bill. Denied.

Ramsey & De Meules, of Muskogee, Okl., for plaintiff.

Sherman, Veasey & O'Meara, of Tulsa, Okl., for defendants.

CAMPBELL, District Judge. The question is on defendants' motion to dismiss the amended bill. From the bill it appears that· Chunna Gouge was a duly enrolled full-blood member of the Creek Tribe, who had during her lifetime secured an allotment of the lands in controversy, and who died on November 17, 1907, intestate, unmarried, leaving no issue surviving her, but leaving surviving her Jack Gouge, her father, and her mother, Lucinda Gouge, both duly enrolled full-blood members of the Creek Tribe; that her mother, Lucinda, died intestate and without issue surviving her on the 19th day of January, 1908, leaving surving her the said Jack Gouge, and Big Jack and Bettie, her father and mother, respectively, both duly enrolled full-blood members of the Creek Tribe; that both Chunna Gouge and Lucinda Gouge were at the time of their respective deaths residents of McIntosh county, Okl., and the county court of that county had jurisdiction of the settlement of their respective estates; that on May 13, 1912, the said Jack Gouge and Big Jack and Bettie conveyed the land in controversy to the plaintiff by warranty deed, which was on the same day duly approved by order of the county court of McIntosh county, Oklahoma; that the defendants claim title by virtue of the following transactions: That on August 11, 1909, the said Jack Gouge executed and delivered to one Nix and one Regan an instrument in form of a warranty deed, purporting to convey to them the lands in controversy; that on August 17, 1909, the said Big Jack executed and delivered to the said Nix an instrument in form of a warranty deed, purporting to convey to him the lands in controversy; that on April 18, 1910, the said Jack Gouge executed to the said Nix an instrument in form of warranty deed, purporting to convey to him the land in controversy, which deed was on the same date approved by order of the county court of Hughes county, Okl., which order was made by the said court under a gross mistake of fact and on false representations that said Chunna Gouge died within the limits of said Hughes county; that by a series of subsequent conveyances from the said Nix and Regan and their grantees the defendants now claim the title to said land; that the deed of August 11, 1909, from Jack Gouge to Nix and Regan, and the deed of August 17, 1909, from Big Jack to Nix, and the deed of April 18, 1910, from Jack Gouge to Nix, and the several subsequent conveyances under which defendants claim, are void, and are clouds upon plaintiff's title.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Prayer that the several conveyances under which defendants claim be canceled and plaintiff's title quieted.

[1] Who were the heirs of Chunna Gouge? This depends on whether the Creek law, the Arkansas law, or the Oklahoma law of descent and distribution applies. She died on November 17, 1907, just one day after the admission of Oklahoma as a state. It is conceded that, had she died prior to statehood, the descent and distribution of her allotted lands would have been according to chapter 49 of Mansfield's Digest of the Laws of Arkansas.

An examination of congressional legislation relating to the allotment in severalty of Indian lands other than those belonging to the Five Civilized Tribes, which were the subject of the legislation to be hereinafter examined, discloses a uniform policy on the part of Congress to provide that the descent and distribution of such lands upon the death of the allottee shall be subject to the general local laws of descent and distribution of the state or territory in which the allotment is situated.

In the General Allotment Act of February 8, 1887 (24 Stat. 388, c. 119 [Comp. St. 1913, § 4201]), under which act and amendments thereof by far the greater portion of the Indian lands outside of Indian Territory have been allotted in severalty, it was provided (section 5):

"That the laws of descent and partition in force in the state or territory where such lands are situate shall apply thereto after patents therefor have been executed and delivered, except as herein otherwise provided."

In the Osage Allotment Act (Act June 28, 1906, c. 3572, § 6, 34 Stat. 539), it was provided:

"That the lands, moneys, and mineral interests herein, provided for, of any deceased member of the Osage Tribe shall descend to his or her legal heirs, according to the laws of the territory of Oklahoma, or of the state in which said reservation may be hereafter incorporated, except where the decedent leaves no issue nor husband nor wife, in which case said lands, moneys, and mineral interests must go to the mother and father equally."

Similar provisions are found in many other such acts.

By reference to the Choctaw-Chickasaw Agreement, approved July 1, 1902 (Act July 1, 1902, c. 1362, 32 Stat. 641), it is seen (section 16) that Congress had in mind the fact that the lands would, upon the death of the allottee, pass to his heirs, and the surplus land is made inalienable in the hands of the heirs in case the allottee should die within the term of the restrictions. It is provided (section 22) that, where a member dies before receiving his allotment, the land shall pass direct to his heirs, according to the provisions of chapter 49 of the Laws of Arkansas, theretofore extended over the Indian Territory. No special provision, however, is made in this legislation relating to allotment of land in severalty to the Choctaws and Chickasaws for the descent and distribution of the lands so allotted to living allottees. In the case of these two tribes, Congress leaves the matter of descent and distribution of allotted lands to be controlled by general legislation.

Likewise, by reference to the Cherokee Agreement, approved July 1, 1902 (Act July 1, 1902, c. 1375, 32 Stat. 716), it is seen that while it contemplates the passing of the lands allotted thereunder from the allottee to his heirs, and the restriction upon alienation following it into

the hands of the heirs (section 14), and provides, in case of the death of an enrolled member before receiving his allotment, the lands to which he would have been entitled if living shall pass direct to his heirs according to the laws of Arkansas in force in the Indian Territory, no special provision is made in this act in relation to the descent and distribution of allotted lands of deceased Cherokee allottees. Here again Congress has left the matter of such descent and distribution to be controlled by general local laws.

Turning now to the Seminole Agreements: The only provision relating to laws of descent and distribution is found in the agreement approved June 2, 1900 (Act June 2, 1900, c. 610, 31 Stat. 250), reading as follows:

"Second. If any member of the Seminole Tribe of Indians shall die after the thirty-first day of December, eighteen hundred and ninety-nine, the lands, money, and other property to which he would be entitled if living, shall descend to his heirs who are Seminole citizens, according to the laws of descent and distribution of the state of Arkansas, and be allotted and distributed to them accordingly: Provided, that in all cases where such property would descend to the parents under said laws the same shall first go to the mother instead of the father, and then to the brothers and sisters, and their heirs, instead of the father."

But the foregoing provision has no relation to cases where the allottee dies after having received his allotment, but is clearly confined in its operation to cases where the allottee dies before receiving his allotment, as in the other agreements referred to, and provision is made for the allotment of his share of the lands direct to his heirs according to the Arkansas law. Here again Congress refrains from legislating especially with regard to the descent and distribution of Seminole allotted lands, leaving that matter, as in the case of the other tribes mentioned, to be controlled by general law. The question then arises: What general law controlled as to the devolution of these Indian estates?

By act of Congress approved May 2, 1890 (26 Stat. 81, c. 182), certain laws of the state of Arkansas, as published in Mansfield's Digest, so far as not locally inapplicable or in conflict with any other act of Congress, were extended over and put in force in Indian Territory until Congress should otherwise provide. Among these laws was chapter 49 of said Digest, providing in detail for the descent and distribution of real and personal property. But by the same act it was provided that the judicial tribunals of the several nations or tribes should retain exclusive jurisdiction of all civil and criminal cases in which members of such nations should be the only parties, and that nothing in the act should be so construed as to deprive any such courts of exclusive jurisdiction over all cases where members of the tribes were the sole parties, and that as to all such cases the laws of the state of Arkansas, extended over Indian Territory by the act, should not apply. This no doubt reserved from the effect of chapter 49 of the Arkansas law so extended the devolution of the property of deceased members of the Five Civilized Tribes, leaving that to be controlled by tribal laws. By the Indian Appropriation Act of June 7, 1897 (30 Stat. 83, c. 3), it was provided:

"Provided, further, that on and after January first, eighteen hundred and ninety-eight, the United States courts in said territory shall have original and exclusive jurisdiction and authority to try and determine all civil causes in law and equity thereafter instituted and all criminal causes for the punishment of any offense committed after January first, eighteen hundred and ninety-eight, by any person in said territory, and the United States commissioners in said territory shall have and exercise the powers and jurisdiction already conferred upon them by existing laws of the United States as respects all persons and property in said territory; and the laws of the United States and the state of Arkansas in force in the territory shall apply to all persons therein, irrespective of race, said courts exercising jurisdiction thereof as now conferred upon them in the trial of like causes; and any citizen of any one of said tribes otherwise qualified who can speak and understand the English language may serve as a juror in any of said courts."

By act of Congress approved June 28, 1898 (30 Stat. 495, c. 517), it was provided (section 26) that the laws of the several tribes should no longer be enforced at law or in equity in the United States courts in Indian Territory, and (section 28) that after the 1st day of October, 1898, the Creek and other tribal courts should be abolished. Clearly this had the effect of subjecting the members of the Creek and other tribes and their property to the Arkansas law of descent and distribution already extended in Indian Territory. Nivens v. Nivens, 4 Ind. T. 30, 64 S. W. 604; Id., 4 Ind. T. 574, 76 S. W. 114; 25 Ops. of Atty. Gen. 163.

By act of Congress approved March 1, 1901 (31 Stat. 861, c. 676), the original agreement with the Creek Tribe was ratified and confirmed, subject to ratification by the Creek Council, which followed in due time. Provision was made in this agreement for the completion of the tribal rolls and the allotment of the tribal lands to the several tribes. In section 7 of this agreement, the alienation of allotted lands by the allottees or *their heirs* is prohibited for a term of years. This, of course, contemplates the passing of the allotted lands to the heirs upon the death of the allottees, according to some law of descent and distribution. In the same section it is then provided that each allottee shall select from his allotment a homestead of forty acres, to be inalienable for 21 years, to remain after his death for the use and support of children, if any, born to him after the ratification of the agreement, but if none such, and it be not disposed of by will, to descend to his heirs according to the laws of descent and distribution of the Creek Nation, free from restrictions. By section 28 of this agreement it is provided that citizens of the tribe entitled to enrollment and living upon April 1, 1899, should be enrolled, and if any such should die before receiving his allotment the land to which he would be entitled if living should "descend to his heirs according to the laws of descent and distribution of the Creek Nation, and be allotted and distributed to them accordingly." In the same section it is also provided that children born to citizens entitled to enrollment up to July 1, 1900, and then living, should also be enrolled, and if any such child should die before receiving its allotment the land which it would be entitled to if living should likewise "descend to its heirs according to the laws of descent and distribution of the Creek Nation," etc.

A supplemental agreement was entered into with the Creek Tribe, and ratified by act of Congress approved June 30, 1902 (32 Stat. 500, c. 1323), section 6 of which is as follows:

"The provisions of the act of Congress approved March 1, 1901 (31 Stat. 861), in so far as they provide for descent and distribution according to the laws of the Creek Nation, are hereby repealed, and the descent and distribution of land and money provided for by said act shall be in accordance with chapter 49 of Mansfield's Digest of the Statutes of Arkansas now in force in Indian Territory: Provided, that only citizens of the Creek Nation, male and female, and their Creek descendants shall inherit lands of the Creek Nation: And provided further, that if there be no person of Creek citizenship to take the descent and distribution of said estate, then the inheritance shall go to noncitizen heirs in the order named in said chapter 49.".

By the amendment, the *descent* and *distribution,* to which the Creek law is applied in the original agreement, is made subject to the Arkansas law "now in force in Indian Territory." But, as we have seen, the descent and distribution of lands other than homesteads—that is, surplus lands—was not especially provided for in the Original Agreement. Hence such lands are not affected by section 6 of the Supplemental Agreement. The descent of these surplus lands, not having been especially provided for in the agreements, was controlled by the laws of Arkansas in force in the Indian Territory, applicable to Indian estates by virtue of the acts of June 7, 1897, and June 28, 1898, supra, and the amendment, effected by section 6 of the Supplemental Agreement, substituting the Arkansas law for the Creek law, in connection with the other legislation noted, had the effect of making the Arkansas law apply uniformly for the purpose of determining descent and distribution of Creek lands, alike in cases where the allottee died after receiving his allotment and in the case of heirs of a deceased member who died before receiving his allotment. Then, as if to remove any possible doubt as to its policy of submitting the descent and distribution of these allotted lands in Indian Territory to the operation of the general law upon that subject, in force in the territory, Congress provided, in the act of April 28, 1904 (33 Stat. 573, c. 1824):

"All the laws of Arkansas heretofore put in force in the Indian Territory are hereby continued and extended in their operation, so as to embrace all persons and estates in said territory, whether Indian, freedmen, or otherwise, and full and complete jurisdiction is hereby conferred upon the district courts in said territory in the settlements of all estates of decedents, the guardianships of minors and incompetents, whether Indians, freedmen, or otherwise."

From the date of this last-mentioned act up to statehood, it is clear that the descent and distribution of all Indian estates in Indian Territory was subject to the Arkansas law in force generally in the territory. In other words, Congress by the legislation above reviewed, culminating in the act last quoted, had provided that the descent and distribution of Indian estates in the Indian Territory should be controlled by the local laws on that subject, in keeping with the policy of the General Allotment Act and other legislation above referred to. Labadie v. Smith, 41 Okl. 773, 140 Pac. 427. It is true the laws of descent and distribution, like all other general laws in force in Indian Territory, were established by act of Congress, there being

218 F.—25

no local legislative body as in organized territories; but they were none the less local territorial legislation, as contradistinguished from those acts of Congress relating especially to the Indians and their lands. Shulthis v. McDougal, 225 U. S. 561, 32 Sup. Ct. 704, 56 L. Ed. 1205.

But the Oklahoma Enabling Act (Act June 16, 1906, c. 3335, 34 Stat. 267) provided (section 13) "that the laws in force in the territory of Oklahoma, as far as applicable, shall extend over and apply to said state until changed by the Legislature thereof," and (section 21) that "all laws in force in the territory of Oklahoma at the time of the admission of said state into the Union, shall be in force throughout said state, except as modified or changed by this act or by the Constitution of the state." The Constitution of the state provided that the laws in force in Oklahoma Territory upon the intervention of statehood, should be in force in the state until changed by the Legislature. This extended to the Indian Territory portion of the state the law of descent and distribution on and after the admission of Oklahoma on November 16, 1907. By the Enabling Act Congress evinced its intention to provide, so far as it might do so, for the application of the laws of Oklahoma Territory throughout the new state.

It is urged that it was beyond the power of Congress to stipulate what should be the laws of the new state, so far as matters of purely state cognizance were concerned, and this is true; but it was within the province of the state constitutional convention to determine what laws should control as state laws until the state Legislature had an opportunity to provide otherwise, and the constitutional convention did so, and, following the terms of the Enabling Act, provided that the laws in force in Oklahoma Territory at the time of the admission of the state should become the laws of the state until changed by the Legislature. But Congress did have power to provide laws of descent and distribution controlling the devolution of lands of the members of the several Indian tribes from which the restrictions upon alienation had not been removed. There is nothing, however, in the Enabling Act to indicate that Congress intended to change the policy established by the act of April 28, 1904, and other legislation heretofore reviewed, that the lands of Indians should be controlled by the local general laws of descent and distribution. It is provided that this local general law after statehood shall be that in force in Oklahoma Territory upon the admission of the state.

The purpose of the Enabling Act was to provide for the formation of the state of Oklahoma by combining Oklahoma Territory and Indian Territory. To this Congress gave its consent. The Indians of the Five Civilized Tribes and all other Indians of the Indian Territory were by the terms of the act made eligible to citizenship in the new state, and subject in their person and property to the operation of its laws, except as to certain restrictions upon the alienation of their allotted lands and kindred matters, with regard to which Congress had especially legislated. The descent and distribution of their lands Congress had, as we have seen, committed to the operation of the local laws of the Indian Territory. This law of descent and dis-

tribution, together with all other general laws peculiar to Indian Territory, must of course, upon the advent of statehood, give place to the laws provided for the new state. This Congress contemplated when it provided in the Enabling Act that the laws in force in the territory of Oklahoma should apply. The constitutional convention so provided. The several state courts established by the Constitution became by the terms of the Enabling Act the successors of the United States courts in Indian Territory; the court having probate jurisdiction thereby succeeding to the full and complete jurisdiction conferred upon district courts in said territory by the act of April 28, 1904, in the settlement of all estates of decedents and guardianship of minors and incompetents, whether Indians, freedmen, or otherwise. Clearly Congress contemplated that, in the exercise of this jurisdiction over the persons and property of the Indians, these courts would administer the state laws as applied to matters of descent and distribution and kindred matters, except in regard to features as to which Congress had especially legislated otherwise.

It is argued that because, in section 9 of the act of May 27, 1908, it is provided that the homestead shall descend according to the laws of descent and distribution of the state of Oklahoma, the Arkansas law must have controlled as to homesteads up to that time, else it would have been unnecessary to specifically mention the Oklahoma law. This, however, does not in my judgment necessarily follow, when it is considered that the controlling purpose of the section is the removal of restrictions upon alienation of lands of deceased allottees, with the limitation in case of certain issue surviving. The provision that the descent and distribution shall be according to the Oklahoma law is but another manifestation of the policy of Congress that the devolution of these Indian estates shall be controlled, except as otherwise specifically provided, by the local general laws of descent and distribution.

I therefore conclude that when Chunna Gouge died on November 17, 1907, her allotment, both homestead and surplus, descended to her heirs according to the law in force in Oklahoma Territory on November 16, 1907, when the state was admitted, which had then become the law of the state of Oklahoma.

[2] The law in force in Oklahoma Territory, relating to "wills an·' successions," on November 16, 1907, when the state was admitted, provided:

"When any person having title to any estate not otherwise limited by marriage contract dies, without disposing of the estate by will, it is succeeded to and must be distributed, unless otherwise expressly provided in this code and the chapter on probate court, subject to the payment of his debts, in the following manner: * * * (2) * * * If decedent leave no issue, nor husband, nor wife, the estate must go to the father." Wilson's R. S. Oklahoma, vol. 2, § 6895.

Chunna Gouge left no issue, nor husband, nor wife; therefore upon her death the land in controversy passed to her father, Jack Gouge, who survived her. Both the plaintiff and the defendants claim title through Jack Gouge—the plaintiff, by his deed of May 13, 1912, approved on the same day by order of the county court of McIntosh

county, which the bill alleges was the residence of Chunna Gouge at the time of her death; the defendants, through their deed of August 11, 1909, from Jack Gouge to Nix and Regan, and deed of April 18, 1910, from Jack Gouge to Nix, which latter deed was approved by the county court of Hughes county, the former deed not appearing to have been approved by order of any court. By the act of Congress approved May 27, 1908 (35 Stat. 312, c. 199), it is provided:

"Sec. 9. That the death of any allottee of the Five Civilized Tribes shall operate to remove all restrictions upon the alienation of said allottee's land: Provided, that no conveyance of any interest of any full-blood Indian heir in such land shall be valid unless approved by the court having jurisdiction of the settlement of the estate. of said deceased allottee."

The bill alleges that both Chunna Gouge, the deceased allottee, and Jack Gouge, her father and heir, were full-blood Indians. Hence, while the death of Chunna Gouge operated to remove the restrictions from the land allotted to her, Jack Gouge, her full-blood heir, could not make a valid conveyance of the same, unless approved by the court having jurisdiction of the settlement of her estate. The bill alleges that she was a resident of McIntosh county, Okl., at the time of her death. In that case the county court of McIntosh county was the court having jurisdiction of the settlement of her estate. Wilson's Revised and Anno. Stats. of Oklahoma, vol. 1, §§ 1483–1485.

But it is contended by the defendants that inasmuch as it appears from the order of the county court of Hughes county, approving the deed of April 18, 1910, from Jack Gouge to Nix, which order is made an exhibit to the bill, that that court found as a fact that Chunna Gouge was a resident of Hughes county at the time of her death, that finding cannot be collaterally attacked in this proceeding. While it may be conceded that if the county court of Hughes county, in approving this deed, acted in the exercise of its judicial functions as such county court, its findings as to facts relating to its jurisdiction to so act cannot be collaterally attacked, still the question arises: Was its action the exercise of a judicial function, or was it merely a ministerial act? In 11 Cyc. at page 693, it is said:

"Where courts of general jurisdiction do not act within the scope thereof, but exercise other and special statutory powers in derogation of, or not according to, the course of the common law, or where such special powers are purely ministerial, no presumption of jurisdiction favors the judgments of said courts, since by the exercise of such special powers a court stands in this respect on the same footing with courts of limited and inferior jurisdiction."

By section 22 of the act of April 26, 1906 (34 Stat. 137, c. 1876), it was provided that adult Indian heirs of deceased Indians of either of the Five Civilized Tribes might sell lands inherited from them, with the further proviso that:

"All conveyances made under this provision by heirs who are full-blood Indians are to be subject to the approval of the Secretary of the Interior, under such rules and regulations as he may prescribe."

Section 9 of the act of May 27, 1908, above quoted, merely continues this right of alienation so far as adult heirs are concerned, but provides that the approval shall be by the court mentioned, rather

than by the Secretary of the Interior. That that action of the Secretary of the Interior in approving or disapproving deeds under the provision of section 22 of the act of April 26, 1906, above quoted, was in no sense judicial, but was purely ministerial, is established by Jennings v. Wood, 192 Fed. 507, 112 C. C. A. 657, wherein the effect of the Secretary's approval of an Indian lease was involved. Now, so far as these full-blood conveyances of inherited lands are concerned, the act of May 27, 1908, merely appoints in the place of the Secretary of the Interior, for the purpose of their approval, the court having jurisdiction of the settlement of the estate of the deceased Indian from whom the land is inherited. The power and authority conferred upon the court is merely that, therefore, conferred upon the Secretary of the Interior by the former act. In Van Fleet on Collateral Attack of Judicial Proceedings, § 799, this principle is laid down in this wise:

"In a collateral assault on a right or title held by virtue of the action of a tribunal, it is of vital importance whether its action was judicial or ministerial; because, if judicial, no error will affect the right or title unless so grave as to prevent jurisdiction from attaching or to destroy it afterwards, but, if ministerial, any substantial error will defeat it."

In Black on Judgments, § 379, it is said:

"It is said, in a New Hampshire decision, that whenever a tribunal possesses qualified and limited powers, authorizing them to act in certain specified cases only, and by special modes of proceeding, and the law has provided no mode by which these proceedings can be revised, then the proceedings may be impeached collaterally by showing that the court or magistrates have acted in a case where they have no jurisdiction, or by modes of procedure which they are not authorized to adopt. The same principle, under a slightly different aspect, is stated in a Connecticut case as follows: Where a statute confers upon a tribunal of limited and statutory jurisdiction a special power, to be exercised under particular circumstances and in a particular manner, it is indispensable to the valid exercise of the power that such circumstances exist at the time and that the court proceed in the exact manner prescribed; and where the record of such court finds the existence of those circumstances, and that such manner of proceeding was adopted, the finding is only prima facie proof of those facts and they may be disproved by parole evidence."

In the case of State ex rel. Thomas Adamson, Petitioner, v. Lafayette County Court, Respondent, 41 Mo. 222, wherein the sheriff sought by writ of mandamus to compel the county court to approve his bond, the court said:

"Now is the approval or rejection of a sheriff's bond by the county court the exercise of such judicial function or discretion as will preclude this court from any supervisory control of its action? G. S. § 2, p. 113, provides that the sheriff shall give bond and security to the state, to the satisfaction of the county court. The only duty of the court is to be satisfied that the bond and security is sufficient. There is nothing presented before the tribunal for adjudication, and its action is not the exercise of a judicial discretion or judgment within the meaning of the rule. The approval or rejection of the bond is essentially a ministerial act, though coupled with a discretion."

In re Saline County Subscription, 45 Mo. 52, 100 Am. Dec. 337, was an application for a writ of certiorari to review the action of a county court in subscribing to railroad stock and issuing bonds for payment thereof. The court, after holding that a writ of certiorari

would only lie to review the judicial action of the court, further held that the act of the county court in subscribing for the railroad stock, and issuing the bonds, was ministerial, and not judicial, and therefore denied the writ. The court in its opinion said:

"A county court is certainly a judicial body for some purposes, but no more so for the name, nor for the fact that it has a seal and a clerk and keeps a record. The character of its action in a given case must decide whether that action is judicial, ministerial, or legislative, or whether it be simply that of a public agent of the county or state, as in its varied jurisdiction it may by turns be each. * * , * The proceedings in general of county courts in probate matters have been treated as judicial, especially when they are adverse, and parties are brought in, or are supposed to be in court. * * * The case of St. Joe & Denver City Railroad Company v. Buchanan County expressly decides the case at bar; and all the cases are inconsistent with the idea that the exercise of a discretionary power, given by law to the county court of Saline county, if it be given to make a subscription to the stock of a railroad, can be in any sense a judicial proceeding. A court has no discretion, but must render judgment according to the facts and the law, while this subscription might have been made or refused. The judges were bound, it is true, to act with good judgment, judiciously; but exercising a sound judgment is by no means synonymous with rendering judgment, and acting judiciously is not always acting judicially."

In the case of Brown v. Wheelock, 75 Tex. 385, 12 S. W. 111, was involved the question as to whether the district court acted judicially in removing the disabilities of a minor under a statute similar to that in force upon the same subject in this state, and the court said:

"Can an order which, under the statute, removes the disabilities of a minor, be deemed in strict language the judgment of a court? We think not. It fixes no right; it settles no dispute. It acts merely upon the status of the applicant, enlarges his capacity as a free agent, and, as to all matters not political, places him upon the plane of persons who have attained their majority. If the proceeding should be deemed judicial, we should be compelled to hold the statute in conflict with 'the Constitution, for the reason that it attempts to confer upon the district courts a jurisdiction not embraced in these courts as defined by the Constitution. This court has repeatedly held that 'the jurisdiction of these courts is strictly limited to the suits mentioned in section 8, art. 5, of our Constitution. Harrell v. Lynch, 65 Tex. 146; Ex parte Towles, 48 Tex. 413; Williamson v. Lane, 52 Tex. 344; State v. De Gress [72 Tex. 242] 11 S. W. 1029."

[3] I conclude that the action of the court having jurisdiction of the settlement of the estate of the deceased allottee, in approving or disapproving conveyances by his full-blood heirs, is in no sense judicial. The only court having authority in the matter is one having the jurisdiction prescribed. In this case it was the county court of McIntosh county, because Chunna Gouge, the allottee, was a resident of that county when she died. It is not necessary that the jurisdiction should first have been exercised by the taking of some steps looking to the settlement of the estate. Mullen v. Short, 38 Okl. 333, 133 Pac. 230. But such jurisdiction must inhere in the court assuming to approve such conveyances. The approval by any other court is unauthorized and void, and any finding made by such court may be collaterally attacked.

It follows that in this case the approval of the county court of Hughes county of the deed from Jack Gouge to the defendant lends

no validity to that instrument. It stands as an unapproved deed, and is therefore void.

[4] It is urged that, because of representations made by or on behalf of Jack Gouge in the proceedings before the county court of Hughes county, he and his privies are now estopped from questioning the validity of the action of that court. There is no merit in this contention. The disabilities under which these wards of the government are placed as to the alienation of restricted lands is very similar to those attaching to minors with reference to their contracts, and in the latter case it is established that the acts and declarations of a minor during infancy cannot estop him from asserting the invalidity of his debts after he has attained his majority. Sims v. Everhardt, 102 U. S. 300, 26 L. Ed. 87.

The motion to dismiss in this case will be overruled. It is so ordered.