# BRADER v. JAMES.

No. 4721.   Opinion Filed January 11, 1916.

(154 Pac. 560.)

1.   **INDIANS — Allotment — Deed Conveying Inherited Lands — Validity.** Section 22 of the act of Congress of April 26, 1906 (34 Stat. at L. 137, c. 1876), giving to the adult heirs of any deceased Indian of either of the Five Civilized Tribes whose selection has been made, or to whom a deed or patent has been issued for his or her share of the land of the tribe to which he or she belongs or belonged, authority to sell and convey the lands inherited from such decedent, but which further provides, "All conveyances made under this provision by heirs who are full-blood Indians are to be subject to the approval of the Secretary of the Interior, under such rules and regulations as he may prescribe," renders void a deed to inherited lands, whether surplus or homestead, allotted during the lifetime. of a deceased full-blood Choctaw, who died prior to the date of the passage of the act, where the heir, an adult full-blood Choctaw, attempted to convey by deed, on August 17, 1907, without obtaining the approval of the Secretary of the Interior to such conveyance.

2.   **SAME.** The title to the lands in controversy being, at the date of the passage of the act of April 26, 1906, in the defendant in error, any conveyance thereafter made by her was controlled by the law then in force; and as such law provided that a conveyance by a full-blood Indian heir was subject to the approval of the Secretary of the Interior, and such approval not having been secured, the deed was void.

3.   **INDIANS — Guardianship — Termination — Power of Congress.** Congress, in pursuance of the long established policy of the government, has a right to determine for itself when the guardianship which has been maintained over the Indian shall cease.

4.   **SAME—Alienation of Inherited Allotted Lands—Approval.** Congress, in the exercise of its constitutional authority, and while the guardianship relation over full-blood Indians continues, may impose restrictions on full-blood Indian heirs, requiring that conveyances by them of inherited allotted lands be. approved by the Secretary of the Interior; and this, notwithstanding the restrictions imposed by prior legislation have expired by limitation, or by the death of the allottee.

5.    **SAME—Statutes.** The Acts of Congress of July 1, 1902 (32 Stat. at L. 641, c. 1362), April 26, 1906 (34 Stat. at L. 137, c. 1876), June 16, 1906 (34 Stat. at L. 267, c. 3335), and May 27, 1908 (35 Stat. at L. 312, c. 199), pertaining to the affairs of the Chickasaw and Choctaw Indians, and the Enabling Act, evince no intention on the part of the United States to discontinue or surrender, but on the contrary, to continue, its relation of guardianship over full-blood Choctaw and Chickasaw . Indians, in respect to the alienation by them of inherited allotted lands.

6.    **SAME—Validity of Statute—Impairment of Rights.** The rights of full-blood Choctaws, who were made citizens of the United States by the act of March 3, 1901 (31 Stat. at L. 1447, c. 868), with all the rights, privileges, and immunities of such citizens, were not unconstitutionally impaired by Act April 26, 1906, par. 22, imposing restrictions upon the alienation by them of inherited allotted lands, notwithstanding that prior to the passage of the act the lands so inherited, or a part thereof, may have been free of all restrictions.

(Syllabus by the Court.)

Hardy, J., dissenting.

*Error from District Court, Choctaw County;*
*A. H. Ferguson, Judge.*

Action by Rachel James, nee Reeves, against J. H. Brader. Judgment for plaintiff, and defendant brings error. Affirmed.

*Downs & Ellis* and *E. A. Blythe,* for plaintiff in error.

*Works & Copping,* for defendant in error.

*C. C. Herndon, Tibbetts & Green, H. A. Ledbetter, Joseph P. Rossiter, J. C. Wright,* and *E. E. Hood, amici curiae.*

SHARP, J.. On October 27, 1905, Cerena Wallace, a full-blood Choctaw Indian, died, leaving as her sole surviving heir at law her daughter, Rachel James, *nee* Reeves, the defendant in error. Thereafter, and on the 17th day of August, 1907, said defendant in error, a

full-blood Choctaw, joined by her husband, Davis James, attempted to convey by warranty deed a part of the lands inherited by her from her deceased mother, the lands sold constituting the homestead allotment of 160 acres and 40 acres of the surplus allotment. On the 13th day of September, 1909, the purchaser, Tillie Brader, for the consideration of $1, executed to the plaintiff in error, J. H. Brader, a quitclaim deed to said land. The deed executed by Rachel James and her husband to Tillie Brader was never approved by the Secretary of the Interior, neither does it appear that it was ever presented for approval. On August 28, 1912, Rachel James instituted in the district court of Choctaw county an action at law to recover the possession of said land, and for the use and occupation thereof during the time the same was occupied by defendant, Brader. Trial being had, judgment was awarded plaintiff for the possession of the land and for $250, which sum the court found to be the reasonable rental value of the property, after crediting the defendant with the value of all improvements which he had erected thereon.

The record before us fairly presents these questions : (1) Could Rachel James, a full-blood Choctaw Indian, on and after the 26th day of April, 1906, and before May 27, 1908, convey the lands inherited by her from her mother, who was a full-blood Choctaw Indian, which lands had been allotted to her during her lifetime, so as to give a good title to the purchaser, without the conveyance being approved by the Secretary of the Interior; (2) if the legislation of Congress undertook to make such conveyances valid only when approved by the Secretary of the Interior, is it constitutional?

The allotment made to Cerena Wallace was under authority of, and, originally in the matter of alienation, controlled by, sections 12, 15, and 16 of the Supplemental Agreement with the Choctaws and Chickasaws of July 1, 1902 (32 Stat. at L. 641, c. 1362). According to section 12 of said agreement, it was provided that each member of said tribes should, at the time of the selection of his allotment, designate as a homestead out of said allotment lands equal in value to 160 acres of the average allottable land of the Choctaw and Chickasaw Nations, as nearly as might be, which should be inalienable during the lifetime of the allottee, not exceeding 21 years from the date of certificate of allotment, and that separate certificate and patent should issue for said homestead. As to the surplus allotment, it was provided by section 16 that all the lands allotted to the members of said tribes, except such land as was set aside to each for a homestead, as therein provided, should be alienable after the issuance of patent as follows: One-fourth in acreage in one year, one-fourth in acreage in three years, and the balance in five years; in each case from date of patent; provided, that such land should not be alienable by the allottee or his heirs, at any time before the expiration of the Choctaw and Chickasaw tribal governments, for less than its appraised value. In section 15 it was provided that lands allotted to members should not be affected or incumbered by any deed, debt or obligation of any character, contracted prior to the time at which said land might be alienated under said act, nor should said land be sold except as therein provided. It will be observed that the homestead lands were inalienable "during the lifetime of the allottee, not

exceeding 21 years from the date of certificate of allotment."

The period of restriction was thus definitely limited, and the clear implication, is that when the prescribed period should expire, the lands were to become alienable; that is, by the heirs of the allottee upon his death, or by the allottee himself at the end of 21 years. Thus, with respect to homestead lands, the Supplemental Agreement ·imposed no restriction upon alienation by the heirs of a deceased allottee. This was the view taken in *Mullen et al. v. United States,* 224 U. S. 448, 32 Sup. Ct. 494, 56 L. Ed. 834, where it was said that, where lands were allotted to a living member of the tribe, upon his death the homestead portion thereof descended free of restrictions. When the 40 acres of surplus allotment became· alienable it is impossible to determine from the record; neither, as we shall presently see, is it important to a determination of the case. Some 16 months prior to the conveyance by Rachel James, Congress passed the act of April 26, 1906 (34 Stat., at L. p. 137, c. 1876). From this act it appears that Congress had undertaken to make new provisions for the protection of full-blood Indians of the Five Civilized Tribes, and to place them, as to the alienation, disposition, and incumbrance of their lands, under restrictions such as to operate to protect them, and to require the Secretary of the Interior to approve conveyances of certain classes of Indians, in order that they might part with lands of the character named therein only upon fair remuneration, and when their interests had been sufficiently safeguarded by competent authority. This intention is clearly expressed in various sections of the act, particularly in sections 19, 21, 22, and 23. While all are important,

and bear upon the question of the policy of Congress with regard to full-blood Indians, section 22 is the only one with which we are directly concerned. This section provides:

"That the adult heirs of any deceased Indian of either of the Five Civilized Tribes whose selection has been made, or to whom a deed or patent has been issued for his or her share of the land of the tribe to which he or she belongs or belonged, may sell and convey the lands inherited from such decedent; and if there be both adult and minor heirs of such decedent, then such minors may join in a sale of such lands by a guardian duly appointed by the proper United States court for the Indian Territory. And in the case of the organization of a state or territory, then by a proper court of the county in which said minor or minors may reside or in which said real estate is situated, upon an order of such court made upon petition filed by guardian. All conveyances made under this provision by heirs who are full-blood Indians are to be subject to the approval of the Secretary of the Interior, under such rules and regulations as he may prescribe."

The leading authority, apparently relied upon by both sides, construing this act, is that of *Tiger v. Western Investment Co.,* 221 U. S. 286, 31 Sup. Ct. 578, 55 L. Ed. 738. There, however, the act was passed prior to the expiration of the five-year period of restrictions contained in section 16 of the Creek Supplemental Agreement of June 30, 1902 (32 Stat. at L. 500, c. 1323). In all other, if indeed not in all, respects, the case furnishes a controlling authority. The same construction of section 22 of the act of 1906 was urged by the defendants in that case as is insisted upon by the plaintiff in error here. Construing the act in connection with the subsequent act of May 27, 1908 (35 Stat. at L. 312, c. 199),

it was held to have been the purpose of Congress to require conveyances provided by section 22 to be approved by the Secretary of the Interior. It was said that the sections of the act of April 26, 1906, under consideration showed a comprehensive system of protection as to full-blood Indians. Various sections of the act concerning different classes of transactions were pointed out, and it was stated that under section 19, full-blood Indians were not permitted to alienate, sell, dispose of, or incumber allotted lands within 25 years, unless Congress otherwise provided; that the leasing of their lands, other than homesteads, for more than one year, could be made under rules and regulations prescribed by the Secretary of the Interior; that in case of the inability of a full-blood Indian, already owning a homestead, to work or farm the same, the Secretary might authorize the leasing of such homestead; that under section 20 leases and rental contracts of full-blood Indians, with certain exceptions, were required to be in writing, subject to the approval of the Secretary of the Interior; that under section 23 authority was given to all persons of lawful age and sound mind to devise and bequeath all their estates, real and personal, and all interests therein, but that no will of a full-blood Indian, devising real estate, and disinheriting his parent, wife, spouse, or children, should be valid until acknowledged before and approved by a judge of the United States Court for the Indian Territory, or by a United States Commissioner. Particular consideration was then given to section 22, which it was said would enable full-blood Indians, as well as others, to convey inherited allotted lands, but that conveyances made under said section by heirs who were full-blood Indians should be subject to the approval of

the Secretary of the Interior. This, it was admitted, would have the effect of extending the requirements of the approval of the Secretary of the Interior as to full-blood Indians beyond the term prescribed in section 16 of the act of 1902, and it was said such was the purpose of Congress, which, it was stated, was emphasized in paragraph 29 of the act, wherein all previous inconsistent acts and parts of acts were repealed. Answering the contention that it was not intended Congress should interfere with Indian full-blood heirs in their right to make conveyances after the expiration of the five years named in paragraph 16 of the act of 1902, it was said that, had Congress intended not to interfere with full-blood Indians in their right to make conveyances after said time, it would have been easy to say so, and some reference would probably have been made to the prior legislation. It was further observed that no reference was made to the prior legislation, but that it was broadly enacted that all conveyances of the character named in paragraph 22, made by heirs of full-blood Indians, should be subject to the approval of the Secretary of the Interior. To use the language of the court:

"The construction contended for by the defendant in error places Congress in the attitude of requiring such conveyances to be made with the approval of the Secretary of the Interior for the time between the passage of the act of 1906 and the expiration of the period named in the act of 1902, with unrestricted power thereafter to make such conveyances without such approval. Such construction is inconsistent with subsequent legislation of Congress upon the same subject, and which proceeds upon the theory that, in the understanding of Congress at least, restrictions still existed so far as the inherited lands of full-blood Indians were concerned."

After reviewing various provisions of the act of May 27, 1908, it was said that the obvious purpose of those provisions was to continue supervision over the right of full-blood Indians to dispose of land by will, and to require conveyances of interests of full-blood Indians in inherited lands to be approved by a competent court, as provided in said latter act, after which conclusion the court further observed:

"We cannot believe that it was the intention of Congress, in view of the legislation which we have quoted, to leave untouched the five-year restriction of the act of 1902, so far as the inherited lands of full-blood Indians are concerned, or to permit the same to be conveyed without restriction from the expiration of that five-year period until the enactment of the legislation of May, 1908."

Attention was then called to the terms of the Enabling Act for the admission of the State of Oklahoma (34 Stat. at L. 267, c. 3335), after which, upon the question then under consideration, the court concluded:

"We agree with the construction, contended for by the plaintiff in error, and insisted upon by the government, which has been allowed to be heard in this case, that the act of April, 1906, while it permitted inherited lands to be conveyed by full-blood Indians, nevertheless intended to prevent improvident sales by this class of Indians, and made such conveyances valid only when approved by the Secretary of the Interior."

The proviso to section 22, if taken literally, can lead to but one conclusion, and that is: All deeds to inherited allotted lands, made by full-blood Indian heirs, after the passage of the act, are subject to the approval of the Secretary of the Interior. Said section conferred upon heirs the right to sell and convey inherited lands, but of full-blood Indian heirs it was re-

quired that all conveyances made by them should be subject to the approval of the Secretary of the Interior, under such rules and regulations as that officer might prescribe. In other words, the right of alienation was given upon the condition, in the case of full-blood Indian heirs, that the Secretary of the Interior should be satisfied with and approve the conveyance made; the obvious object of the provision being one of protection to the Indian.

Nor is there anything in the language used, or in the history of the times, to indicate a purpose to confine the operation of the statute to sales and conveyances made by full-blood heirs to lands thereafter inherited, and to exclude lands inherited, but not conveyed, prior to its adoption. The one class needed protection as much as the other, and both are equally within the statute, fairly construed.

In *Mullen v. United States*, 224 U. S. 448, 32 Sup. Ct. 494, 56 L. Ed. 834, the lands conveyed to the appellants were described as those which had been allotted to Choctaws of the full blood, deceased; and the conveyances were made by the full-blood heirs prior to April 26, 1906, and prior to which time there was, as we have seen, no restrictions upon the right of alienation of such heirs. In other words, the heirs in that case had authority of law to make the deeds attacked, notwithstanding the fact that they were full bloods; this, under section 22 of the Supplemental Agreement. That attention is called to the fact that the conveyances were made prior to April 26, 1906, is, to our minds, significant, for if the act of that date is without force as to unrestricted inherited lands of full bloods, it would not matter when the conveyance was made, if the con-

tention of the plaintiff in error be correct. Our conclu-
sion, then, is that the proviso or latter clause of sec-
tion 22 of the act of April .26, 1906, means just what
it says, and requires that all deeds made by full-blood
Indian heirs of inherited allotted lands, since the pas-
sage. of the act, in order to be valid, must be approved
by the Secretary of the Interior. This, too, regardless
of the fact that Cerena Wallace, the full-blood allottee,
died before the passage of the act of April 26, 1906,
for it is the law in force at the date of conveyance, and
not that of the time of the death of the ancestor, that
controls. *MaHarry v. Eastman*, 29 Okla. 46, 116 Pac.
935; *Harris v. Gale* (C. C.) 188 Fed. 712; *United States
v. Knight et al.*, 206 Fed. 145, 124 C. C. A. 211; *Ste-
phens v. Smith*, 10 Wall. 321, 19 L. Ed. 933.

Passing to the question of the constitutionality of
the act, we refer again to the opinion in *Tiger v. West-
ern Investment Company, supra*. There Marchie Tiger,
the full-blood Creek heir, had sold and conveyed the
allotted lands inherited by him, after the expiration of
the five-year restriction period. It was held by the court
that the rights of the Creek Indians, who were made
citizens of the United States by the act of March 3,
1901 (31 Stat. at L. 1447, c. 868), with all the rights,
privileges, and immunities of such citizens, were not
unconstitutionally impaired by the Act of April 26,
1906, paragraph 22, extending the prohibition against
the alienation of allotted lands by the allottee or his
heirs without the approval of the Secretary of the In-
terior, created by the Creek Supplemental Agreement of
June 30, 1902, beyond the five-year limitation therein
named. In considering this subject we must remember
that the Congress of the United States has undertaken

from the earliest history of the government to deal with the Indians as a dependent people, and to legislate concerning their property with a view to their protection as such dependents. *Cherokee Nation v. Georgia,* 5 Pet. 1, 17, 8 L. Ed. 25, 31; *Stephens v. Cherokee Nation,* 174 U. S. 445, 484, 19 Sup. Ct. 722, 43 L. Ed. 1041, 1055; *United States v. Kagama,* 118 U. S. 375, 6 Sup. Ct. 1,109, 30 L. Ed. 228; *Lone Wolf v. Hitchcock,* 187 U. S. 565, 23 Sup. Ct. 216, 47 L. Ed. 306. And we may say, further, that the power of the general government to deal with, control, and protect the property of Indians, where not expressly abandoned, may not fairly be open to controversy. Arising originally out of the necessities of the situation, it now has the support of immemorial legislative and executive usage, and likewise that of judicial sanction, as evidenced in a long line of decisions of the Supreme Court. This power remains in full force and vigor until its further exercise is deemed unnecessary by those in whom it rests. *Worcester v. Georgia,* 6 Pet. 515, 8 L. Ed. 483; *United States v. Rickert,* 188 U. S. 439, 23 Sup. Ct. 478, 47 L. Ed. 536; *Wallace v. Adams,* 204 U. S. 420, 27 Sup. Ct. 363, 51 L. Ed. 550, and cases last cited.

On March 2, 1906, by joint resolution, Congress extended the tribal existence and government of the Five Civilized Tribes of Indians in the Indian Territory; and in section 28 of the very act under which it is provided that the deed of a full-blood Indian heir to inherited lands shall be approved by the Secretary of the Interior, and in less than two months after the passage of the joint resolution, Congress enacted that the tribal existence and the then present tribal governments of the Choctaw, Chickasaw, Cherokee, Creek, and Semi-

nole Nations were continued in full force and effect for all purposes authorized by law, until otherwise provided by law, with certain enumerated limitations upon the tribal authority. Neither this act nor the act of May 27, 1908, evinced an intention on the part of Congress to abandon or terminate the relation of guardianship over those whom it regarded as a dependent people, but on the other hand, manifested a purpose to continue that relation. Also, in passing the Enabling Act for the admission of the State of Oklahoma, Congress was careful to preserve the authority of the government of the United States over the Indians, their lands, property or other rights, which it had prior to the passage of the act. 34 Stat. at L. 267, c. 3335. *Ex parte Webb,* 225 U. S. 663, 32 Sup. Ct. 842, 56 L. Ed. 1248. As to both tribal unallotted lands and annuities, and otherwise, the government retained, and yet retains, the former control. This is also true in the matter of protecting the Indian in the lands from which restrictions have not been removed. Such was the conclusion of the Supreme Court in *Heckman v. United States,* 224 U. S. 413, 32 Sup. Ct. 424, 56 L. Ed. 820, 829, where it is said by Mr. Justice Hughes:

"The placing of restrictions upon the right of alienation was an essential part of the plan of individual allotment; and limitations were imposed by each of the allotment agreements. The separate statutes were supplemented by the general acts of 1906 and 1908, already mentioned. These restrictions evinced the continuance, to this extent at least, of the guardianship which the United States had exercised from the beginning. That the conferring of citizenship was in no wise inconsistent with the retention of control over the disposition of the allotted lands was expressly decided in the case of *Tiger v. Western Inv. Co.,*" etc.

See, also, *Wiggins v. Connoly,* 163 U. S. 56, 16 Sup. Ct. 914, 41 L. Ed. 69; *Perrin v. United States,* 232 U. S. 478, 34 Sup. Ct. 387, 58 L. Ed. 691; *Bowling v. United States,* 233 U. S. 528, 34 Sup. Ct. 659, 58 L. Ed. 1080; *Jefferson v. Winkler,* 26 Okla. 653, 110 Pac. 755; *Texas Co. v. Henry,* 34 Okla. 342, 126 Pac. 224.

Powers, rights, and interests of sovereignty are never relinquished by mere lapse of time or by implication. Once rightfully established and asserted, they are presumed to exist, and to continue to exist until abandoned by express terms. This principle applies alike to prerogatives of the executive, powers of the legislative, and the jurisdiction of the courts. *United States v. Knight,* 14 Pet. 301, 10 L. Ed. 465; *United States v. Herron,* 20 Wall. 251, 22 L. Ed. 275. As expressed in *Wheeling & Belmont Bridge Co. v. Wheeling Bridge Co.,* 138 U. S. 287, 11 Sup. Ct. 301, 34 L. Ed. 967:

"An alleged surrender or suspension of a power of government respecting any matter of public concern must be shown by clear and unequivocal language; it cannot be inferred from any inhibitions upon particular officers, or special tribunals, or from any doubtful or uncertain expressions."

Construing section 7 of the act of Congress of May 27, 1902 (32 Stat. at L. 275), authorizing the adult heirs of any deceased Indian, to whom allotted lands had been patented, to sell inherited lands subject to the approval of the Secretary of the Interior, and providing that when so approved full title should pass to the purchaser, the same as if a final patent without restrictions on alienation had been issued to the allottee, the Circuit Court of Appeals, in *National Bank of Commerce v. An-*

*derson,* 77 C. C. A. 259, 147 Fed. 90, in holding that the trust attached to the proceeds of the sale, said:

"We construe the act as expressing the intention of Congress, not to end the trust, but to permit a change of the form of the trust property. The property being held in trust by the United States for a period which had not yet expired, and which period was subject to * * * extension by the President, the intention to terminate the trust must be found to be clearly expressed in order to warrant us in holding that the trust does not follow the property in its changed form."

There Henry Taylor, the heir, though a citizen of the United States, was an Indian of the Puyallup Tribe. He lived his own independent life, had severed his tribal relation, and was neither dependent on the government nor under official control.

A very able opinion is that of Judge Sanborn in *United States v. Thurston County,* 143 Fed. 287, 74 C. C. A. 425, where, after referring to the fact that the Indian was also a citizen of the United States and of the State of Nebraska, it is said:

"Their civil and political status, however, does not condition the power, authority, or duty of the United States to exert its powers of government to control their property, to protect them in their rights, to faithfully discharge its legal and moral obligations to them, and to execute every trust with which it is charged for their benefit. *Matter of Heff,* 192 U. S. 488, 509 [25 Sup. Ct. 506], 49 L. Ed. 848; *Buster v. Wright,* 68 C. C. A. 505, 135 Fed. 947; *Wallace v. Adams,* 74 C. C. A. 540, 143 Fed. 716. * *. * They are still members of their tribes and of an inferior and dependent race, of which the Supreme Court has said that 'from their very weakness and helplessness, so largely due to the course of dealing of the federal government with them and the treaties in which it has been promised,' there arises the

duty of protection, and with it the power. This has always been recognized by the executive and by Congress, and by this court, whenever the question has. arisen.' *United States v. Kagama,* 118 U. S. 375, 384 [6 Sup. Ct. 1109], 30 L. Ed. 228."

We cite these two latter cases as authority upon the question that Congress has not terminated the relation of trust, but has, on the other hand, zealously continued its exercise.

It is for Congress, and not the courts, to determine when and how the relation of guardianship shall be abandoned. As was said in *Tiger v. Western Investment Co., supra,* after reviewing many former opinions of that court upon the subject:

"Taking these decisions together, it may be taken as the settled doctrine of this court that Congress, in pursuance of the long-established policy of the government, has a right to determine for itself when the guardianship which has been maintained over the Indian shall cease. It is for that body, and not the courts, to determine when the true interests of the Indian require his release from such condition of tutelage."

Also, as said in *United States v. Celestine,* 215 U. S. 278, 30 Sup. Ct. 93, 54 L. Ed. 195, speaking to the question under consideration:

"It is not within the power of the courts to overrule the judgment of Congress."

Whether the restrictions on alienation as provided in the Supplemental Agreement, under which the lands were allotted, had or had not expired does not of itself, and while the title remains in the Indian, determine that Congress has renounced its power to legislate in the latter's behalf as a dependent. Upon this question we again quote from the Tiger case:

"Upon the matters involved our conclusions are that Congress has had at all times, and now has, the right to pass legislation in the interest of the Indians as a dependent people; that there is nothing in citizenship incompatible with this guardianship over the Indian's lands inherited from allottees, as shown in this case; that in the present case, when the act of 1906 was passed, Congress had not released its control over the alienation of lands of full-blood Indians of the Creek Nation; that it was within the power of Congress to continue to restrict alienation by requiring, as to full-blood Indians, the consent of the Secretary of the Interior to a proposed alienation of lands such as are involved in this case; that it rests with Congress to determine when its guardianship shall cease, and while it still continues, it has the right to vary its restrictions upon alienation of Indian lands in the promotion of what it deems the best interest of the Indian."

The relation of guardianship between Rachel James and the general government did not depend upon whether the lands inherited by her were alienable at the time descent was cast. Neither was the power of Congress to impose restrictions made to rest upon there being restrictions in force at the time of the passage of the act. It is because of the relation of guardianship at the time existing between the general government and Rachel James that Congress had the power to impose restrictions on her right to convey lands inherited by her. As was said in *Heckman v. United States, supra*:

"During the continuance of this guardianship, the right and duty of the nation to enforce by all appropriate means the restrictions designed for the security of the Indians cannot be gainsaid. While relating to the welfare of the Indians, the maintenance of the limitations which Congress has prescribed as a part of its plan of distribution is distinctly an interest of the United States. A review of its dealings with the tribes permits no other

conclusion. Out of its peculiar relation to these dependent people sprang obligations to the fulfillment of which the national honor has been committed."

Until this guardianship had been unequivocally renounced, Congress could, in its wisdom, continue the exercise of its judgment in respect to the rights and privileges that should be accorded those of her class. The relationship being the source from which the power is derived, the imposition during its continuance of a new restriction stands upon the same ground as the extension of one yet in force. In other words, the existence of the right of guardianship cannot be made to depend upon the existence of a restriction on a particular piece of land. If the relations of the Indian to the government were, in every respect, save for the bare existence of a restriction upon his title, the same as those of a noncitizen white man, the restriction could not be constitutionally enlarged without the Indian's consent, because, being *sui juris* himself, his power to dispose of his allotment would be absolutely measured by the terms of his deed, and any attempt to vary those terms would be a clear invasion of his property rights. But it would be absurd to say that the authority to vary a restriction is conferred by a restriction. If, therefore, the power is not to be derived from the restriction itself, but must come from the relation of guardianship, of which the restriction is merely one evidence, it must follow that the existence of the restriction is wholly immaterial to the exercise of the power. The power that is correlative to the duty of protection must be such as is adequate to the occasion. If, while an Indian remains a ward of the nation, Congress should make a gross mistake in giving him full control over property essential to his

welfare, but which he is not fitted to protect, Congress, acting for him, and with a view to his protection, may correct the mistake, for, as already seen, the power of Congress is not alone dependent upon legislation being had while a limitation remains in effect. The guardianship is of the person as well as of the property. Hence the right to deal with the Indian liquor problem; the right to educate the Indians; to sell their unallotted lands, and keep and pay out per capita the moneys derived therefrom, at will; to appoint probate attorneys; and generally to superintend, counsel, and guide them in their personal affairs. It is the government's peculiar function and duty to afford him protection. This he needs in respect of all his property. Congress, whenever it chooses, may renounce its control and its protective care over the individual. Until that is done, it is safe to assume that there is a reason for continuing the relation; that the Indian is not ready for complete liberation from restraint, and that whatever liberties or disposition over his property are allowed him from time to time are in the way of experiments, subject to recall if found hasty and ill-advised. The restriction upon alienation is but one mode of exercising the general protective power over those Indians whom Congress may regard as dependent. The power to impose a restriction is entirely consistent with the possession by the individual Indian of rights which are constitutionally protected from interference by Congress. He may not be arbitrarily deprived of property, but the protection of his property is a legitimate and necessary exercise of the power of guardianship, subject to which his property is held; and the imposition of restraint upon his liberty of disposition is a necessary and legitimate means of protecting his property.

Not only is this view borne out by the decision in the Tiger case, but in the early case of *Stephens v. Smith,* 10 Wall. 321, 19 L. Ed. 933. In *Choate et al. v. Trapp,* 224 U. S. 665, 32 Sup. Ct. 565, 56 L. Ed. 941, the distinction between the right to exemption from taxation based on a sufficient consideration and the power of Congress to impose a limitation on alienation was expressly recognized. Meeting the contention of the state that the act of May 27, 1908 (35 Stat. at L. 312, c. 199), was not in fact a tax exemption, but was intended only to guard absolutely against alienation of the land, whether for taxes, or at judicial sale, or by private contract, or, differently expressed, that the tax exemption was only an additional prohibition against a sale, so that when the restrictions against alienation were removed by the act, the provision as to nontaxability went as a necessary part thereof, it was said:

"But the exemption and nonalienability were two separate and distinct subjects. One conferred a right and the other imposed a limitation. * * * The right to remove the restriction was in pursuance of the power under which Congress could legislate as to the status of the ward and lengthen or shorten the period of disability. But the provision that the land should be nontaxable was a property right, which Congress undoubtedly had the power to grant."

It will be seen that the statute involved undertook to destroy this right by making lands from which restrictions had been removed, subject to taxation by the local taxing authorities. Section 22 contains no such provision, but, instead, requires that conveyances by full-blood Indian heirs shall be subject to approval by the Secretary of the Interior, under such rules and regulations as he may prescribe.

We are not unmindful that the Circuit Court of Appeals, in *Bartlett et al. v. United States,* 203 Fed. 410, 121 C. C. A. 520, held that it was not within the power of Congress to reimpose a restriction upon the alienation of land against which none at the time existed. The Bartlett Case did not involve the alienation of inherited lands, neither did it involve the relationship between the general government and full-blood Indians. Besides, the act under consideration was that of May 27, 1908, which expressly excluded from its operation the imposition of restrictions removed from land by or under any law enacted prior to its passage. It was upon this ground that the decision was affirmed on appeal to the Supreme Court of the United States. *United States v. Bartlett et al.,* 235 U. S. 72, 35 Sup. Ct. 14, 59 L. Ed. 137. Section 9 of the latter act provided:

"That the death of any allottee of the Five Civilized Tribes shall operate to remove all restrictions upon the alienation of said allottee's land: Provided, that no conveyance of any interest of any full-blood Indian heir to such land shall be valid unless approved by the court having jurisdiction of the settlement of the estate of said deceased allottee."

The court, however, had before it for construction section 1 of the act continuing restrictions upon the living allottees, to which was attached the proviso already referred to. While it was said by the court, referring to the former section:

"If taken literally, the language which we have quoted from the act of 1908 is doubtless broad enough to impress all allotments of the class described, whether then subject to the original restriction or theretofore freed from it"

—and it was held that, on account of the proviso, the language was not to be taken literally. Whether this

proviso includes inherited lands named in section 9 of the act it is unnecessary to consider, for we are not construing the latter act, but instead, in the respect mentioned, distinguishing it from the former. Whether in principle the Bartlett Case may be distinguished from the one under consideration need not be considered or determined, for in the recent case of *United States v. Western Investment Company* (C. C. A.) 226 Fed. 276, it was held that, though the period for which the Creek allotment made a prior allotment to an Indian, confirmed thereby, inalienable by the allottee or his heirs without approval of the Secretary of the Interior expired before enactment of the act of April 26, 1906, c. 1876, sec. 22 (34 Stat. at L. 145), prohibiting full-blood heirs of a deceased Indian conveying his land without approval of such officer, a conveyance by such heir of such land after such enactment was subject thereto. In that case, according to the opinion, the lands inherited by the grantor, Mary Bird, a full-blood Creek Indian, were free of restrictions from the 1st day of March, 1906, until April 26th following. The opinion is rested upon section 22 of the act of April 26, 1906, requiring that conveyances by heirs who are full-blood Indians shall be subject to the approval of the Secretary of the Interior, and the decision of the Supreme Court in the Tiger Case that Congress had not, by the Supplemental Creek Agreement, or by any other act, released its control over the alienation of full-blood Creek Indians, and that it was within its power to continue to restrict such alienation by requiring the approval of the Secretary of the Interior of conveyances made by them.

In *United States v. Shock* (C. C.) 187 Fed. 870, it was said that it was within the power of Congress to

impose restrictions upon the alienation of lands of Indian allottees, although restrictions imposed by prior legislation had expired by limitation. In *United States v. Allen,* 179 Fed. 13, 103 C. C. A. 1, it was held that it was within the power of Congress to enlarge the period within which an Indian allottee is prohibited from alienating his land beyond that imposed when the allotment is made, so long as the land is held by the allottee, although in the meanwhile he may have been made a citizen of the United States.

Nor does the opinion, *In re Heff,* 197 U. S. 488, 25 Sup. Ct. 506, 49 L. Ed. 848, announce a different rule. In that case, section 6 of the General Allotment Act of February 8, 1887 (24 Stat. at L. 388, c. 119), provided:

"That upon the completion of said allotments and the patenting of the land to said allottees, each and every member of the respective bands or tribes of Indians to whom allotments have been made shall have the benefit of and be subject to the laws, both civil and criminal, of the state or territory in which they may reside; and no territory shall pass or enforce any law denying any such Indian within its jurisdiction the equal protection of the law."

Heff was convicted in the United States Court in 1904, of having violated the act of Congress of January 30, 1897. (29 Stat. at L. 506, c. 109), by selling intoxicating liquors to one John Butler, a Kickapoo Indian, to whom certain lands had been allotted under the act of February 8, 1887. It was contended by the petitioner, in his application for a writ of *habeas corpus,* that the act of January 30, 1897, was unconstitutional as applied to the sales of liquor to an Indian who had received an allotment and patent of lands

under the provisions of the act of February 8, 1887, be-
cause it was provided in said act that each and every In-
dian to whom allotments had been made should be sub-
ject to the laws, both civil and criminal, in the state in
which said allottee might reside, and, further, that said
Butler, having received an allotment of land in severalty
and his patent therefor under the provisions of the al-
lotment act, was no longer a ward of the government, but
a citizen of the United States and of the State of Kan-
sas, and subject to the laws, both civil and criminal, of
said state.   After reviewing a number of the decisions
of that court, pertaining to the relationship between the
government and the Indians, and the rights and obliga-
tions consequent thereon, it was said that a new policy
had found expression in the legislation of Congress, the
purpose of which was the breaking up of tribal relations,
the establishment of separate Indians in individual homes,
free from national guardianship, and charged with all
the rights and obligations of citizens of the United
States.   The court said:

"Of the power of the government to carry out this
policy there can be no doubt.   It is under no constitu-
tional obligation to perpetually continue the relationship
of guardian and ward.   It may, at any time, abandon its
guardianship and leave the ward to assume and be sub-
ject to all the privileges and burdens of one *sui juris:*
And it is for Congress to determine when and how that
relationship of guardianship shall be abandoned.   It is not
within the power of the courts to overrule the judgment
of Congress.   It is true there may be a presumption that
no radical departure is intended, and courts may wisely
insist that the purpose of Congress may be made clear by
its legislation, but when that purpose is made clear, the
question is at an end."

In a former treaty between the Kickapoos, concluded June 28, 1862 (Revision of Indian Treaties, art. 3, p. 449), it was provided:

"At any time hereafter, when the President of the United States shall have become satisfied. that any adults, being males and heads of families, who may be allottees under the provision of the foregoing article, are sufficiently intelligent and prudent to control their affairs and inter- ests, he may, at the requests of such persons, cause the land severally held by them to be conveyed to them by patent in fee simple, with power of alienation; and may, at the same time, cause to be * * * [set apart and placed to their credit severally] their proportion of the cash value of the credits of the tribe, principal and in- terest, then held in trust by the United States, and also, as the same may be received, their proportion of the pro- ceeds of the sale of lands under the provisions of this treaty. And on such patents being issued, and such pay- ments ordered to be made by the President, such com- petent persons shall cease to be members of said tribe, and shall become citizens of the United States; and there- after the lands so patented to them shall be subject to levy, taxation, and sale, in like manner with the prop- erty of other citizens."

In construing the two treaties the court said:

"Now the act of 1887 was passed 25 years after the treaty of 1862 with the Kickapoos, and must be con- strued in the light of that treaty. By the treaty it was declared that at the instance of the President, and upon compliance with specified provisions, certain of the Indians should be considered as competent persons, should cease to be members of the tribe, and become citizens of the United States."

It was said that, the act of 1897 being a police reg- ulation, it could not be doubted that an act of Congress, attempting as a police regulation to punish the sale of

liquor by one citizen of the state to another, within the territorial limits of that state, would be an invasion of the state's jurisdiction, and could not be sustained, and it would be immaterial what the antecedent status of either buyer or seller was. The point decided by the court was that when the United States granted the privilege, or privileges, of citizenship to an Indian, gave to him the benefits of, and required him to be subject to, the laws, both civil and criminal of the state, it placed him outside the reach of police regulations on the part of Congress; that the emancipation from federal control, thus created, could not set aside at the instance of the government, without the consent of the individual and the state; and that this emancipation from the federal control was not affected by the fact that the lands it had granted to the Indian were granted subject to a condition against alienation or incumbrance, or the further fact that it guaranteed him an interest in tribal or other property. The difference in the facts before the court in the Heff Case and those before us in no way makes the decision in that case an authority. Without enumerating these distinctions, several of which stand out conspicuously, it is sufficient to say that in that case, involving as it did a police regulation, there had been, by express congressional enactment, an emancipation of the Indian from federal control, by the express terms of which he became subject to both the civil and criminal laws of the state in which he resided. Here no such abdication of power or surrender of control appears, but instead, as already seen, the various acts of Congress, touching the question of both the form of removal and imposition of restrictions, gave evidence conclusive of an intention on the part of the general government to con-

tinue, for the time being, its relation of guardianship over full-blood Indians.

At the date of the passage of the act of April 26, 1906, the Choctaw and Chickasaw Indians were residents of, and their lands were situated in, an unorganized territory. Their tribal governments were shorn of all power, and existed in name only. There was none other to control and manage their affairs than the general government. The legislation of Congress in behalf of the full-blood Indians is a matter of current history. No less so, however, is the vigilance and activity displayed in the other branches of government, brought about by congressional enactment. Many suits were brought by the United States in carrying out its policy of protection to those whom Congress regarded as dependents and in need of protection. Indeed, at all times, on and since the passage of the act, has the government shown a most determined and persistent purpose to continue the exercise of the authority derived from its guardianship relation, and in the Enabling Act to see that the power was reserved to it.

A case sometimes cited as authority for a conclusion different from that which we have reached is *Jones v. Meehan,* 175 U. S. 1, 20 Sup. Ct. 1, 44 L. Ed. 49, where, however, a quite different question was before the court. In that case, Moose Dung, the younger, the heir at law of the senior Moose Dung, in 1891, executed to the Meehans a lease to certain lands which had been set apart to his father during the latter's lifetime, of which estate the younger Moose Dung was the sole heir at law. Afterwards, in 1894, said younger Moose Dung executed a second lease to said lands to Jones. Subsequent thereto, and during the same year, Congress passed a joint reso-

lution, authorizing the Secretary of the Interior, in his discretion, to approve the latter lease. This was afterwards done, and the contest over the possession arose between the two lessees, a portion of the terms of the leases running concurrently. It was held that the elder Moose Dung, having acquired a complete title in fee simple, his heir, upon whom the estate devolved at his death, had the right to make the original lease, and that the interests of the lessees acquired thereby could not be devested by any subsequent action of the lessor, or of Congress, or of the executive department of the government. The court said:

"The congressional resolution of 1894, and the subsequent proceedings in the Department of the Interior, must therefore be held to be of no effect upon the rights previously acquired by the plaintiffs by the lease to them from the younger chief."

The decision, therefore, is not an authority for the contention that Congress is without power to impose restrictions on alienable allotted lands of full-blood Indians.

It may be well to note that the act enjoined upon the Secretary of the Interior is in no sense judicial, but, on the other hand, is purely ministerial. *Jennings v. Wood,* 192 Fed. 507, 112 C. C. A. 657. It follows the making of a bargain between the heir or heirs and the intending purchaser. The Secretary's jurisdiction is invoked only when the conveyance is presented to him for his approval. As was said in the above case:

"His connection with the transaction and his authority first arose after the minds of the contractors came together, and they must have been competent to make the contract submitted for approval . A disapproval was merely a veto."

The rule that the act is ministerial is the same under the act of May 27, 1908, requiring the approval by the county courts of the deeds of full-blood heirs. *Tiger v. Creek County Court*, 45 Okla. 701, 146 Pac. 912; *Bartlett v. Okla. Oil Co. et al.* (D. C.), 218 Fed. 380.

It should be remembered that the lands the title to which is in controversy were allotted to Cerena Wallace during her lifetime. What effect, if any, the act of 1906 would have on conveyances made by the full-blood Indian heirs of enrolled tribal members who died subsequent to enrollment, but before selecting their allotments, and where allotments were thereafter duly made in their name or on behalf of their heirs, not being directly involved, is not determined, and nothing herein is intended to affect the rights of such heirs or those holding under or through them. From what has been said, we are of the opinion that Congress, in the passage of the act of April 26, 1906, acted within the scope of its lawful authority, and that the deed from Rachel James to the plaintiff in error, not having been approved as required by law, was void.

It follows that the judgment of the lower court should be, and the same is, affirmed.

All the Justices concur, except HARDY, J., dissenting.

HARDY, J. I dissent from that portion of the opinion holding that the conveyance of the homestead lands was void. It was necessary that the conveyance of the surplus lands be approved. *Gannon v. Johnson*, 40 Okla. 695, 140 Pac. 430, Ann. Cas. 1915D, 522. Cerena Wallace, the allottee, died October 21, 1905, after having selected the lands in controversy as her allotment. This

was prior to the passage of the act of Congress approved April 26, 1906 (34 Stat. L. 137) ; .therefore the homestead descended free from restrictions upon the alienation thereof. *Mullen v. United States,* 224 U. S. 448, 32 Sup. Ct. 494, 56 L. Ed. 834.

Upon reviewing the authorities cited by the court, it is seen that the holding of the court in *United States v. Allen,* 179 Fed. 13, 103 C. C. A. 1, is stated in the ninth paragraph of the syllabus as follows:

"It is within the power of Congress to enlarge the period within which an Indian allottee is prohibited from alienating his land beyond that imposed when the allotment was made, so long as the land is held by the allottee, although in the meantime he may have been made a citizen."

This case was reversed by the Supreme Court in so far as it held that the United States could maintain a suit to set aside conveyances to lands after restrictions thereon had expired. *Mullen et al. v. United States, supra; Goat v. United States,* 224 U. S. 458, 32 Sup. Ct. 544, 56 L. Ed. 841; *Deming Inv. Co. v. United States,* 224 U. S. 471, 32 Sup. Ct. 549, 56 L. Ed. 847. In *United States v. Shrock* (C. C.), 187 Fed. 870, decided by the Circuit Court for the Eastern District of Oklahoma, the opinion was expressly placed upon the ground that the question of the authority of Congress to reimpose restrictions upon the alienation of lands of Indian allottees was settled in the affirmative so far as this jurisdiction was concerned by the doctrine announced in *United States v. Allen, supra.*

In *United States v. Western Inv. Co.* (C. C. A.), 226 Fed. 726, it was held that, according to the provisions of the act of April 26, 1906, restrictions had been reim-

posed upon the conveyance of inherited lands by the
heirs of a deceased Indian to whom an allotment had
been made in his lifetime.    It will be noted that in this
case the District Court for the Eastern District of Okla-
homa, from which court the appeal was taken, had de-
parted from its holding in the case of *United States v.
Shrock, supra,* and reached the conclusion that restric-
tions could not be reimposed, and the Circuit Court of
Appeals, in reversing the case, reached the opposite re-
sult.    The opinion cites no authorities in support of its
conclusion other than the case of *Tiger v. Western Inv.
Co.,* 221 U. S. 286, 31 Sup. Ct. 578, 55 L. Ed. 738.    I
think I will be able to demonstrate that the case of *Tiger
v. Western Inv. Co., supra,* is not authority for such con-
clusion.

In *Stephens v. Smith,* 10 Wall. 321, 19 L. Ed. 933,
the lands involved were reserved for the use of Victoria
Smith, a half-breed Indian, by the United States under
the provisions of the treaty of June 3, 1825 (7 Stat. 244).
By the eleventh article of that treaty it was stipulated
that the Nation should not sell the lands without per-
mission of the government, and the court observed that
it would assume the contracting parties intended this
prohibition to apply to the individual members of the
tribe.    By act of May 26, 1860 (12 Stat. 21) the title of
the United States to those lands, the use of which had
been allotted to Victoria Smith, was conveyed to her,
and this act declared void all prior contracts for the
sale thereof and forbade any future disposition except
by the Secretary of the Interior, on the request of the
party interested.    Only the use of the lands was allotted
to Victoria Smith prior to the act of May 26, 1860,
and by the very act of conveyance, and as one of the

conditions thereof, the restrictions upon the alienation of said lands were imposed.

The case of *Tiger v. Western Inv. Co., supra,* involved the construction of the act of April 26, 1906, in so far as it affected the prohibition against alienation of allotted lands by the allottee or his heirs, created by the Supplemental Creek Agreement of June 30, 1902, which at the date of the act had not expired; and it was held that under these circumstances Congress had the power *to extend the restrictions.* In the opinion it is stated that the legislation proceeded "upon the theory that in the understanding of Congress at least *restrictions still existed* so far as inherited lands of full-blood Indians are concerned"; and, after a review of the policy of Congress in reference to legislation of this character, and referring to the fact that citizenship had been conferred upon Marchie Tiger, and that citizenship was not incompatible with restriction upon the alienation of said lands, it was said:

"*In this state of affairs* Congress, with plenary power over the subject, by a new act permitted alienation of such lands at any time subject only to the condition that the Secretary of the Interior should approve the conveyance."

And, after declaring the conclusion of the court to be that Congress had at all times the right to pass legislation in the interest of the Indians, it was further said:

"That in the present case, when the act of 1906 was passed, Congress had not released its control over the alienation of lands of full-blood Indians of the Creek Nation; that it was within the power of Congress *to continue to restrict alienation* by requiring, as to full-blood Indians, the consent of the Secretary of the Inte-

rior to a proposed alienation of lands such as are in-involved in this case; that it rests with Congress to determine when its guardianship shall cease, and, while it still continues, *it has the right to vary its restrictions* upon alienation of Indian lands in the promotion of what it deems the best interest of the Indians."

It is significant that throughout the entire discussion by the court the distinction is made clear that at the time the act was passed *the restriction upon the lands involved had not expired,* and that the right of Congress to pass the act is placed upon the conditions existing, and this authority is stated to be that Congress may extend or vary existing restrictions, and nowhere in the opinion is it said that Congress may reimpose restrictions after they have once expired.

The italics throughout this opinion are mine.

Of the authorities cited by the court we find that the Allen Case was criticized by the same court that decided it. The opinion in the Shrock Case was expressly based upon the holding in the Allen Case, and was afterwards departed from by the court rendering the opinion therein. In *United States v. Western Inv. Co.,* the conclusion reached was expressly based upon the holding in *Tiger v. Western Inv. Co.,* and in *Tiger v. Western Inv. Co.* is found no expression by the Supreme Court to the effect that a right exists upon the part of Congress to reimpose restrictions when they have once expired, and in *Stevens v. Smith* the restriction was a condition of the grant.

There is, and can be, no question at this time that when a restriction has expired by lapse of time, it has been removed the same as if done by an express act of Congress or by the Secretary of the Interior. *United*

*States v. Bartlett,* 235 U. S. 72, 35 Sup. Ct. 14, 59 L. Ed. 137; *Choate v. Trapp,* 224 U. S. 665, 32 Sup. Ct. 565, 56 L. Ed. 941.

In *Jones v. Meehan,* 175 U. S. 1, 20 Sup. Ct. 1, 44 L. Ed. 49, an Indian chief owned in fee land which fronted on a stream. The chief died, and in 1891 his son and heir, during the continuance of the tribal organization, let the land to Meehan for ten years. In 1894 he again let the same land to Jones for 20 years. In that year the Secretary of the Interior was authorized by Congress to approve the lease to Jones if the latter would increase the rental. This he did, and with the consent of the Indian and the Secretary of the Interior, the lease was made to Jones. Litigation followed, in which Meehan relied upon the first contract and Jones relied upon that made under Congressional authority. Judgment was for Meehan; and, in reviewing the opinion in that case, the Supreme Court, in *Choate v. Trapp, supra,* said:

"The court held that the subsequent act could not relate back *so as to interfere with the right of property* which the Indian possessed and conveyed as an owner in fee; and, while Congress had power to make treaties, *it could not affect titles already granted by the treaty itself.*"

In *Re Heff,* 197 U. S. 488, 25 Sup. Ct. 506, 49 L. Ed. 848, the court had under consideration the authority of the United States to punish, under its police power, the sale of liquor within a state by a citizen thereof to an Indian who had selected an allotment under the act of February 8, 1887 (24 Stat. L. 388), by which it was provided that each allottee thereunder should have the benefits of and be subjected to the laws of the state

where he might reside, and by the terms of which citizenship was conferred upon each such allottee. The contention was made that because the purchaser was an Indian, notwithstanding he had taken his allotment under the terms of the act and as a citizen of the United States and of the State of Kansas, the United States might punish the sale of liquor to such Indian. In denying this contention, the court, speaking through Mr. Justice Brewer, said:

"But the logic of this argument implies that the United States can never release itself from the obligation of guardianship; that so long as an individual is an Indian by descent, Congress, although it may have granted all the rights and privileges of national, and therefore state, citizenship, the benefits and burdens of the laws of the state, may, at any time, repudiate this action, and reassume its guardianship and prevent the Indian from enjoying the benefits of the laws of the state, and release him from obligations of obedience thereto. Can it be that because one has Indian, and only Indian, blood in his veins, he is to be forever one of a special class over whom the general government may, in its discretion, assume the rights of guardianship which it has once abandoned and this, whether the state or the individual himself consents? We think the reach to which this argument goes demonstrates that it is unsound."

And, after noticing the fact that the lands of the Indians were restricted from alienation, and declaring the rule that an allottee may enforce his right to any interest in the tribal or other property, and that Congress may enforce and protect any condition *which it attaches to any of its grants,* it was further said that the fact that the property was subject to a condition against alienation did not affect the civil or political status of the holder of the title. The extent of the power of Congress to

legislate respecting the personal and political status of such Indians was expressed as follows:

"But it is unnecessary to pursue this discussion further. We are of the opinion that when the United States grants the privileges of citizenship to an Indian, gives to him the benefit of and requires him to be subject to the laws, both civil and criminal, of the state, it places him outside the reach of police regulations on the part of Congress; that the emancipation from federal control thus created cannot be set aside at the instance of the government without the consent of the individual Indian and the state; and that this emancipation from federal control is not affected by the fact that the lands it has granted to the Indian are granted subject to a condition against alienation and incumbrance, or the further fact that it guarantees to him an interest in tribal or other property."

The effect of the holding in the Heff Case is that when Congress has released its guardianship over the personal and political status of the individual Indian to the extent of conferring citizenship on him so that he becomes a citizen of the United States and of the state in which he resides, this grant cannot be retracted without the consent of the state of which he is a resident and the individual himself. This is true because he owes certain duties and is under certain obligations to the state of his residence, and has the rights therein of other citizens. If the theory of the court be true that, because Congress has made an improvident grant to the Indian of property rights, those rights may be taken away because he is still a citizen of the tribe, then by parity of reason a grant of citizenship may also be retracted because guardianship has not been fully and completely surrendered.

49—25

In *Bartlett v. United States,* 203 Fed. 410, 121 C. C. A. 520, the Circuit Court of Appeals for the Eighth Circuit, being the same court which rendered the opinion in the Allen Case and in the case of *United States v. Western Inv. Co.,* in the course of its opinion said that Congress could not, by virtue of the guardianship of the United States, deprive an individual Indian of his full property rights in and to his lands and reimpose restrictions upon the alienation thereof, and the expression in the Allen Case to the contrary was referred to as "mere *obiter.*"

In *Hemmer v. United States,* 204 Fed. 898, 123 C. C. A. 194, a Sioux Indian by the name of Taylor, under the act of March 3, 1875 (18 Stat. 420, c. 131) which gave the benefit of the homestead laws to Indians that might abandon their tribal relations and avail themselves of the homestead laws, but placing a restriction of five years upon the alienation of the lands so homesteaded, entered 160 acres of land in reliance upon said act, and on June 10, 1884, had resided thereon the required length of time to entitle him to make final proof and receive his patent. On July 4, 1884, less than a month thereafter, Congress passed an act enlarging the class of Indians who might avail themselves of the homestead act, and providing a 25-year restriction instead of five years. The court held that the act of 1884 did not apply to Taylor's homestead, he having entered his land under the act of 1875, and resided thereon the full time required before the passage of the act of 1884, and that the latter act did not have the effect of reimposing a restriction for 25 years upon the alienation thereof, although his conveyance was not executed until August 8, 1908.

The question here is whether the right to alienate his allotted or inherited lands is a property right which vests in the individual Indian upon the removal of restrictions.   If it be such, it is protected from legislative impairment by the fifth amendment to the federal Constitution.   I maintain that it is such a right, and therefore the right to reimpose restrictions thereon does not exist.

In *Choate v. Trapp, supra,* the court held the exemption from taxation to be a vested property right, which could not be impaired.   In *Mullen v. United States, supra,* speaking of the interests of the heirs of an Indian who died before receiving his allotment, which was afterwards selected in his name, it was said:

"These Indian heirs were vested with an interest in the property which, in the absence of any provision to the contrary, was the subject of sale.   The fact that they were 'full-blood' Indians makes no difference, for, at the time of the conveyances in question, heirs of the full blood, taking under the provisions of paragraph 22 of the Supplemental Agreement, had the same right of alienation as other heirs."

The right to inherit, purchase, lease, sell, hold, and convey real and personal property is guaranteed to every citizen of the United States, by section 1978, Rev. Stat. (U. S. Comp. St. 1913, sec. 3931), being the Civil Rights Act.   In the *Civil Rights Cases,* 109 U. S. 3, 3 Sup. Ct. 18, 27 L. Ed. 835, it was said that Congress by passing the act under consideration had undertaken—

"to secure to all citizens of every race and color, and without regard to previous servitude, those fundamental rights which are the essence of civil freedom, namely, the same right to make and enforce contracts, to sue, be par-

ties, give evidence, and to inherit, purchase, lease, sell and convey property, as is enjoyed by white citizens."

See, also, *Allgeyer v. State of Louisiana*, 165 U. S. 580, 17 Sup. Ct. 427, 41 L. Ed. 832; *Lochner v. New York*, 198 U. S. 45, 25 Sup. Ct. 539, 49 L. Ed. 937, 3 Ann. Cas. 1133; *Powell v. Penn.*, 127 U. S. 678, 8 Sup. Ct. 992, 1257, 32 L. Ed. 253.

The term "property" has a most extensive signification, and, according to its legal definition, consists in the free use, possession, enjoyment, and disposition by a person of all his acquisitions, without any control or diminution save only by the laws of the land. The term not only includes the thing over which dominion may be exercised, but in its broader sense is that dominion or right of use and disposition which one may exercise over subjects or things, to the exclusion of others, and includes the right to possess, use, enjoy, and dispose of a thing; and it is hard to conceive of property without these rights and attributes therein. 1 Blackstone, Comm. 138; Black's Law Dictionary, title, Property; Anderson's Law Dictionary, title, Property. The authorities defining property are collected in Words and Phrases, title, Property (First and Second Series).

It is true that the right to use and dispose of such property may be regulated by the laws of the land, but this means "regulation" and does not include the right to take or destroy the same without due process of law, and without just compensation. The state may require that a deed of conveyance shall be in writing, and shall be acknowledged and recorded and may specify the manner of acknowledgment and the officer before whom it shall be executed. But when the right to convey, after it has once vested, and where the grantor is possessed of

the full legal and equitable title in the thing conveyed, without condition or restriction, is made to depend upon the will of some third person with the power of veto, the right has been seriously impaired and in effect destroyed. As to a citizen of the United States not of Indian blood, it is conceded this could not be done. No distinction exists in this respect between a white person and an Indian. In *Choate v. Trapp, supra,* it was said:

"There has been comparatively few cases which discuss the legislative power over private property held by the Indians. But those few all recognize that he is not excepted from the protection guaranteed by the Constitution. His private rights are secured and enforced to the same extent and in the same way as other residents or citizens of the United States. *In re Heff,* 197 U. S. 504, 25 Sup. Ct. 506, 49 L. Ed. 855; *Cherokee Nation v. Hitchcock,* 187 U. S. 307, 23 Sup. Ct. 115, 47 L. Ed. 190; *Jackson ex dem. Smith v. Goodell,* 20 Johns. (N. Y.) 188; *Lowry v. Weaver,* 4 McLean, 82, Fed. Cas. No. 8584; *Whirlwind v. Von der Ahe,* 67 Mo. App. 628; *Taylor v. Drew,* 21 Ark. 487. His right of private property is not subject to impairment by legislative action, even while he is, as a member of a tribe, subject to the guardianship of the United States as to his political and personal status."

Referring to the right of Congress to remove restrictions upon the alienation of Indian lands, it was said the right was in pursuance of the power of Congress to lengthen or shorten the period of the Indian's disability, but it was further said that:

"No statute would have been valid which reduced his fee to a life estate, or attempted to take from him 10 acres or 50 acres, or the timber growing on the land."

It was conceded by eminent counsel therein that no right which was actually conferred could be arbitrarily

abrogated by statute, and the court in the discussion of the case said:

"If there were any question as to whether this was a personal privilege and repealable, or an incident attached to the land itself for a limited period, that doubt, under this rule, must be resolved in favor of the patentee."

Determining the effect to be given to the decision in *Tiger v. Western Inv. Co., supra,* which the court thinks justified its conclusion that restrictions may be reimposed on these homestead lands after the original restrictions have been removed, the Supreme Court said:

"Nothing that was said in *Tiger v. Western Inv. Co.* (citing it) is opposed to the same conclusion here, for that case did not involve property rights, but related solely to the power of Congress to extend the period of the Indian's disability. *The statute did not attempt to take his land or any right, member, or appurtenance thereunto belonging.* It left that as it was."

The court then gave the reason underlying the legislation by Congress which extended the time during which the allottee could not sell, and called attention to the fact that:

"Tiger was still a ward of the Nation so far as the alienation of his lands was concerned, and a member of the existing Creek Nation"

—and after stating the rule that citizenship was not incompatible with guardianship, the court continued:

*"But there was no intimation that the power of wardship conferred authority on Congress to lessen any of the rights of property which had been vested in the individual Indian by prior laws or contracts. Such rights are protected from repeal by the provisions of the fifth amendment. * * * We have seen that it was a vested property right which could not be abrogated by statute."*

And again in the opinion it was said, with reference to the power of Congress to legislate with respect to tribal property, that:

"There is a broad distinction between tribal property and private property, and between the power to abrogate a statute and the authority to destroy rights acquired under such law. *Reichert v. Felps,* 6 Wall. 160, 18 L. Ed. 849."

There it is shown that the right to alienate property is property itself, and it is conceded that if such right has vested in a white person, that right cannot be impaired even by Congress. So it is also seen that with reference to vested private rights there is no distinction between an Indian and any other citizen of the United States. This being true, legislation which would impair or lessen such right would be invalid. There is no question about the right of Congress to impose as a condition of its grant restrictions upon the alienation thereof, because the title vests subject thereto, and same operates as a condition annexed to the title; but, when full and complete title in fee simple without condition or restriction has vested, the right of disposition is a property right, and is protected by the fifth amendment.

In *Chase v. United States,* 222 Fed. 593, 138 C. C. A. 117, the United States as trustee and guardian of the Omaha Tribe of Indians and of Rose Wolf Setter, a member of said tribe, brought suit against Hiram Chase, the sole heir of the grantee of a tract of 40 acres of land under section 4 of the treaty of March 6, 1865, with the Omaha Tribe of Indians (14 Stat. 667, 668). The question there was whether Hiram Chase, the sole heir of the grantee of said tract, or Rose Wolf Setter, the sole heir of the grantee of the same land under section 5 of the

act for the sale of a part of the reservation of that tribe, of August 7, 1882 (22 Stat., c. 434, pp. 341, 342), had the title and right of possession of the tract; in other words, whether the treaty of 1865 granted to Clarissa Chase, the mother of defendant, a substantial title to or right in the land in question or a mere revocable license to the possession and use thereof. In reversing the case with instructions to render judgment on the merits in favor of Hiram Chase, the court said:

"If by the treaty of 1865, a substantial right in or title to the land in question was granted to or vested in Clarissa Chase and her heirs, the subsequent act of Congress of 1882 was ineffective to impair or destroy that right or title because:

"First. Indians as well as other residents and citizens of the United States, are protected by the fifth amendment to the Constitution against deprivation of property, life, or liberty without due process of law. No act of Congress or legislative fiat constitutes due process of law, whereby a vested right in or title to property may be either seriously impaired or destroyed. *Choate v. Trapp,* 224 U. S. 565, 670, 677, 32 Sup. Ct. 565, 56 L. Ed. 941; *Jones v. Meehan,* 175 U. S. 1, 20 Sup. Ct. 1, 44 L. Ed. 49; *In re Heff,* 197 U. S. 488, 504, 25 Sup. Ct. 506, 49 L. Ed. 848; *Cherokee Nation v. Hitchcock,* 187 U. S. 294, 307, 23 Sup. Ct. 115, 47 L. Ed. 183; *Jackson v. Goodell,* 20 Johns. (N. Y.) 188; *Lowry v. Weaver,* 4 McLean, 82, Fed. Cas. No. 8584; *Whirlwind v. Von der Ahe,* 67 Mo. App. 628; *Taylor v. Drew,* 21 Ark. 485.

"Second. Except in political cases—and this case is not a political case—Congress has no power, under the Constitution of the United States, to affect rights or titles granted by a treaty, or to determine what rights were granted thereby. Nor may the character of the right or interest granted to Clarissa Chase by the treaty of 1865 be determined by the opinion

of Congress that that right or interest was revocable and negligible, though it be evidenced by its declaration in the act of 1882 that after the new allotments were made under that act the certificates of right and title issued by the Commissioner of Indian Affairs under the treaty of 1865 should be null and void. The construction of treaties and the determination of the character and extent of the rights and titles granted under them is a judicial, and not a legislative function, and by the Constitution the power is granted, and the duty, which may not be renounced, is imposed upon, the courts to form and enforce their independent judgments upon these questions, although these judgments may differ from the opinions of the Congress or its members. *Jones v. Meehan,* 175 U. S. 1-32, 20 Sup. Ct. 1, 44 L. Ed. 49; *Wilson v. Wall,* 6 Wall. 83, 89, 18 L. Ed. 727; *Reichert v. Felps,* 6 Wall. 160, 162, 18 L. Ed. 849; *Smith v. Stephens,* 10 Wall. 321, 327, 19 L. Ed. 933; *Holden v. Joy,* 17 Wall. 211, 247, 21 L. Ed. 523."

If it be once established that Congress may reimpose restrictions upon lands from which same have been removed, it may impose restrictions where none existed. Then if such Indian received title to other lands by inheritance from a white ancestor, or purchased same from funds accumulated by his own toil and industry, the fact of guardianship by the United States over him would authorize Congress to impose restrictions upon the use, enjoyment, and disposition of such property, and also to withdraw the same from state or municipal taxation. It seems clear that such cannot be done, and if it cannot be done, upon what principle can it be said that Congress may draw to itself control over the alienation of other lands, the title of which, both legal and equitable, has been conveyed to the Indians, simply because such lands at one time comprised a part of the Indian domain. If this power may be exercised with reference to the lands,

why may it not be exercised with reference to all kinds of property, even to the extent that if an Indian has a sum of money in the bank, legislation might be enacted placing restrictions upon the disposition and use of such property or money. This is not an illogical deduction from the opinion of the court, and demonstrates the consequences that might possibly follow if guardianship over the Indian be the sole test of the right of Congress to legislate in the respects mentioned. Mixed bloods of whatever degree of blood, together with intermarried citizens, are still wards of the nation in the sense that they are members of existing tribes, and that their tribal affairs have not been completely wound up and their tribal existence dissolved. In this sense they are as much wards of the government as the full-blood heirs of a deceased allottee, and if Congress possesses the power to reimpose a restriction upon the alienation of the lands of a deceased allottee by the heirs thereof in the case of full bloods, as in the case at bar, should Congress determine that previous legislation was unwise, it might reimpose restrictions upon the alienation of the lands of all allottees without regard to the quantum of blood, including intermarried citizens, and might re-enact any legislation regulating the property and affairs of the tribes. Some of the representatives of the state in the halls of the National Congress are members of the Indian tribes, and would be brought within the terms of such restrictive legislation. In short, the Congress could withdraw from the jurisdiction of the state and from the operation of its laws all of the lands in at least one-half of the state, the title to which is still in the hands of the members of Indian tribes. It seems to me clear that this cannot be done.

If Congress may reimpose restrictions upon lands which were selected in the lifetime of the allottee and afterwards descended to his heirs, it may also impose restrictions upon lands which were allotted in the names of Indians who died prior to selecting their allotment. In *Skelton v. Dill*, 235 U. S. 206,. 35 Sup. Ct. 60, 59 L. Ed. 198, and in *Adkins v. Arnold*, 235 U. S. 417, 35 Sup. Ct. 118, 59 L. Ed. 294, it was held that the restrictions imposed by section 16 of the Supplemental Creek Agreement of June 30, 1902, applied only to allotments made to living citizens in their own right, and not to allotments made on behalf of deceased persons under the authority of section 28 of the original agreement of March 1, 1901.

The fact that the legislation may not have been for the best interests of the Indian is not a sufficient reason for the court to depart from the terms of the act as written. As was said by the Supreme Court in *United States v. First National Bank of Detroit*, 234 U. S. 245, 34 Sup. Ct. 846, 58 L. E. 1298:

"If the true construction has been followed with harsh consequences, it cannot influence the courts in administering the law. The responsibility for the justice or wisdom of legislation rests with Congress, and it is the province of the courts to enforce, not to make, the laws."

The policy of Congress with reference to the Indians is stated *In re Heff, supra,* where, after reviewing legislation upon similar questions, it was said:

"Of late years a new policy has found expression in the legislation of Congress—a policy which looks to the breaking up of tribal relations, the establishing of the separate Indians in individual homes, free from national guardianship, and charged with all the rights and obligations of citizens of the United States."

This being the policy of Congress, the statute should be so construed as to be in harmony therewith, and *so as not to interfere with existing rights which have been vested under prior laws*. The rule as stated in 2 Sutherland Stat. Const., sec. 488, is as follows:

"In the construction of the provisions of any statute they ought to receive such a reasonable construction, if the words and subject-matter will admit of it, as *that the existing rights of the public or of individuals be not infringed.*"

In order to ascertain the legislative intent, it is a familiar rule of construction that subsequent legislation upon the same subject may be referred to. *Tiger v. Western Inv. Co., supra.* The act of May 27, 1908 (35 Stat. L. 312), was an act which extended or enlarged restrictions upon the alienation of all allotted lands of mixed bloods of three-fourths or more Indian blood. In that act it was provided:

"Nothing herein shall be construed to impose restrictions removed from lands by or under any law prior to the passage of this act."

Here was a declaration by Congress that legislation of the character involved was not intended to reimpose restrictions which had been removed. Taken in connection with the act of 1906, the conclusion seems to follow that no such effect was intended by that act. On February 27, 1907, Hon. Frank M. Campbell, Assistant Attorney General, in an opinion to the Secretary of the Interior, considering section 22, said:

"This section provides the manner in which sales may be made notwithstanding any restrictions upon alienation, and seems to apply to the heirs of all deceased allottees, without regard to quantum of Indian blood. It cannot,

however, be held to apply to heirs who received their inheritance free from all restrictions.  There would have been no occasion for this provision, or field for its operation, if the same provision which relates to homesteads had extended to the other or surplus allotted lands.  The provision in the act of July 1, 1902, *supra,* is that they may be alienated, one-fourth in acreage in one year, one-fourth in two years, and the balance in five years from the date of the patent.  There is no permissible construction of said section 22 except that it applies, so far as Choctaws and Chickasaws are concerned, to these surplus lands, which descend to the heirs burdened with restrictions upon the alienation, and not upon the homestead, which descends free of all restrictions."  Bledsoe on Indian Land Law [1st Ed.], p. 303.

On August 17, 1909, the Attorney General construed the act of May 27, 1908, and held that conveyances made by full-blood heirs of lands inherited by them prior to the act of May 27, 1908, were not valid unless approved by the Secretary of the Interior, and held, further, that the provisions of section 9 of said act should not be held to operate retroactively and to remove absolutely all restrictions upon the alienation of lands of all allottees who died prior to the passage of that act.  27 Opinions Attorney General, p. 530.  On June 7, 1911, that official rendered an opinion holding that lands allotted to the Choctaws and Chickasaws under the supplemental treaty (Act of July 1, 1902), could not be conveyed prior to act of April 26, 1906, by the full-blood heirs of such allottees within the period of inhibition named by the former act, as that section was not retroactive. 29 Opinions Attorney General, p. 131.

For the foregoing reasons, I think the deed to the homestead was valid without approval.